## FOWLER AND ANOTHER V. STONEUM.

The Act of 1840, (Hart. Dig. p. 454,) to prevent frauds and fraudulent conveyances, embraces the substance of the second Section of the statute of 13 Eliz. Ch. 5, and 27 Eliz. Ch. 4 ; it is proper, therefore, to consult the decisions of the English and American Courts, upon the construction of those statutes, in determining upon the construction to be given to our statute upon the same subject.

See this case for an examination of the English and American decisions on the subject to subsequent purchases, with or without notice, from one who has previously made a conveyance to another to defraud creditors or subsequent purchasers.

See this case for what is said respecting void and voidable.

Not only the grantor and his heirs, but all claiming under him or them, with actual notice, are bound by a deed made to defraud subsequent purchasers, or to hinder and delay creditors.

It is competent to prove by extrinsic evidence, that a deed which is in the form of an absolute or conditional sale, was in fact intended to secure a subsisting indebtedness, and is therefore a mortgage ; and for this purpose it is competent to prove, that at the date of the instrument, there was a settlement of accounts

Fowler v. Stoneum.

between the parties, and an ascertained, antecedent indebtedness on the part of the maker, of the identical sum stipulated to be paid by him.

Where an instrument recited a previous sale of certain property under execution as the property of A, the maker of the instrument, at which sale B became the purchaser, receiving the Sheriff's deed for the property, which sale and deed were by the instrument ratified and confirmed, after which it contained the condition of the payment of money, usually contained in a mortgage, except that instead of the instrument becoming void on the payment of the money, it was stipulated that B should reconvey the property to A, and then went on to express another condition, upon the happening of which the title was to become absolute in B, and the instrument was accepted by B, and suit was afterwards brought upon it by him ; *Held*, That it was a mortgage, and was itself evidence that the title to the property was in A, and not in B, at the time of the making of the instrument.

It is competent for the plaintiff to sue for property, and pray in the alternative, that in case the instrument, which is relied upon by him, as a title, should be adjudged to be merely a mortgage, then that the same be foreclosed, &c.

It seems that exceptions which go to the merits and foundation of the action, may be taken after answer to the merits.

The statute of limitations runs against the claim of a defendant, in reconvention, until the same is set up by plea filed.

Appeal from Harris.   This was a suit by the appellee, for the recovery of certain negroes.   The petition alleges that the plaintiff purchased the negroes at Sheriff's sale, as the property of Benjamin H. Halstead, in the State of Alabama, in November, 1842 ; that on the 12th of June, 1844, he made a conditional sale of the negroes to Halstead, in the county of Montgomery, in this State, which sale was to be completed only in the event of the compliance, by the latter, with certain conditions stipulated to be performed by him, in the contract ; among which conditions were the following : that Halstead should pay, in annual instalments, the several sums of money, specified in the contract, according to its terms and stipulations ; and in the mean time, that he should not sell or remove the property out of the county of Montgomery ; and that, in case he did so, the plaintiff or his agents should take possession of the property, the contract of sale should be dissolved, and the petitioner be allowed to resume the actual possession of the negroes.   The petition further alleges that he left the property in the possesion of Halstead, the better to

enable him to comply with the terms of the contract, and make the stipulated payments; that Halstead, in violation of the terms of said contract, had made a pretended sale of the property, and had delivered the possession thereof to the other defendants, who, well knowing the terms of the contract, and in violation thereof, had clandestinely removed the negroes from the said county of Montgomery, or secreted them therein, with the intent to defraud the plaintiff. The petition further alleges, that the plaintiff is advised that, if, contrary to his intention, the contract should be construed to be a mortgage, or lien to secure the payment of the sum of money therein specified, the said sale and transfer of the possession of the negroes was a fraud upon the rights of petitioner; and he prays for the recovery of the negroes, with damages for their detention, and for general relief. The instrument referred to in the petition, and claimed to be a conditional sale of the property therein described, is as follows:

"REPUBLIC OF TEXAS,  ⎱ Know all men, by these presents—
"*Montgomery County.*⎰ That on the fifth day of Novem-
"ber, A. D., 1842, in Conecuch county, State of Alabama,
"in the Republic of the United States, the Sheriff of said
"county, to wit: David F. Henderson, Esq., did, by virtue
"of an execution issued from the Circuit Court of Butler
"county of said State of Alabama, in the Republic afore-
"said, in favor of George Stoneum and against Benjamin
"H. Halstead, then of the State and county first aforesaid,
"for the sum of eight thousand dollars, besides costs, sell
"according to the laws of said State of Alabama, the
"property described in the foregoing bill of sale signed by
"the said David F. Henderson, as the property of the said
"Benjamin H. Halstead, for which the said George Stone-
"um paid to the said Sheriff, David F. Henderson, the sum
"of seven thousand four hundred and sixty dollars, and
"the said Henderson, Sheriff as aforesaid, made and execut-
"ed the foregoing bill of sale to the property therein named
"and specified, unconditionally and in fee simple, conveying,

" warranting and defending to the said George Stoneum, his
" heirs, executors, administrators or assigns, all the right and
" title to said property, by virtue of said execution and sale
" thereon, which the said Benjamin H. Halstead had owned
" or possessed in the property described in the said bill of
" sale, at the time the property was sold, or any time previ-
" ous, and against the said Benjamin H. Halstead, his heirs
" and assigns forever.

" Now, know ye, that this indenture witnesseth and ac-
" knowledgeth the validity and good faith and valuable con-
" sideration of the said bill of sale, above set out and here-
" in described, to the said property therein named and speci-
" fied, both in law and equity ; and that the said bill of sale
" is by this indenture confirmed and to be recorded with this
" indenture, in accordance with the laws and usages of the
" Republic of Texas in such cases made and provided ; and
" the same is hereby acknowledged by the said Benjamin H.
" Halstead, and is to stand in full force and virtue against
" him, his heirs and assigns—conveying to the said George
" Stoneum, his heirs and assigns, the same right and title to
" the said property in the Republic of Texas, which it con-
" veyed under the laws and regulations of the State of Ala-
" bama—to wit: an unconditional and feesimple title to the
" said property.

" This indenture further witnesseth that the said property
" has been, from the time of the sale aforesaid to the present
" time, under and subject to the control of the said George
" Stoneum, or his agent, and is still to remain subject to his
" control and agency according to the hereinafter mentioned
" exceptions, stipulations and restrictions, and the said Ben-
" jamin H. Halstead is not to bargain, sell or dispose of, or
" carry away any part or parts of said property named and
" specified in said bill of sale, by mortgage, hire or otherwise,
" to any person or persons whatever, but that the same is to
" be at all times subject to the control of the said George Sto-
" neum, or his authorised agent in the Republic of Texas --

" to wit : Julian S. Devereaux and Samuel G. Devereaux, or
" either of them in case one refuses to act, in the county of
·' Montgomery. This indenture further winesseth that if the
" said Benjamin H. Halstead shall well and truly pay, or
" cause to be paid, to to the said George Stoneum, his heirs,
" executors, administrators or assigns, the full and just sum
" of five thousand five hundred and eighty-five dollars and
" eighteen cents, and eight per cent. interest thereon annually,
" in the following manner, to wit : The sum of one thousand
" three hundred and ninety-nine dollars and twenty-nine cents,
" on or before the first day of January, 1847 ; and the further
" sum of one thousand three hundred and ninety-six dollars
" and twenty-nine cents, on or before the first day of January,
" 1848 ; and the further sum of one thousand three hun-
" dred and ninety-six dollars and twenty-nine cents, on or be-
" fore the first day of January, 1849 ; and the further sum
" of one thousand three hundred and ninety-six dollars and
" twenty-nine cents, on or before the first day of January,
" 1850 ; together with interest on the said debt, according to
" the time of the several payments, on the first sum aforesaid ;
" then this indenture witnesseth that the said George Stone-
" um, his heirs, executors, administrators or assigns, is and
" are to reconvey to the said Benjamin H. Halstead, his heirs
" or assigns, that part of the property specified in the said
" bill of sale, which is hereinafter described, to wit : Negro
" man Jerry and wife Phebe ; negro man Jesse and wife Pat-
" sey ; negro man Charles and wife Judy ; boy Solomon :
" girl Julia, boy Berry ; girl Caroline ; girl Harriet ; negro
" woman Peninah and her four children, and negro man
" Base. One wagon and one sorrell mule, three bay mules ;
" bay horse and bay mare. But should any of the aforesaid
" property be wasted, worn out, lost or dead, while in the
" service or employ of the said Benjamin H. Halstead during
" the time specified, for the payment of the said sums of
" money first above specified, it shall be the loss of the said
" Benjamin H. Halstead, and the said George Stoneum is

" not bound to reconvey or make it good; but as to the " wagon horses and mules, the said Halstead is authorised " to sell or swap them, provided he makes them the same " in number, and equally good in quality and value.

" This indenture further witnesseth that the negroes last " mentioned with the wagons, mules and horses, are to be " worked by the said Benjamin H. Halstead, during the time " herein specified for the payment of the sums of money " and the interest annually : provided, nevertheless, that the " said Benjamin H. Halstead shall punctually pay at the pe- " riods above specified, to George Stoneum, his heirs, execu- " tors, administrators or assigns, the several sums of money " respectively above mentioned, with interest as aforesaid, and " shall confine the property, while in his employ, to the coun- " ty of Montgomery ; but should he not comply with the " first of these requisitions, then George Stoneum, and in " his absence, his agent, shall sell so much of the property, · " at public or private sale, as may be considered best by them, " as will meet the payments according to this indenture.  And " should he attempt to move the property from the county " of Montgomery, George Stoneum, or his agents in his ab- " sence, are to take the property into their immediate posses- " sion, by virtue of this indenture, and the titles to the same " said property shall be absolute in George Stoneum, his heirs " or assigns, by virtue of the aforesaid bill of sale, and all " other conditions in this indenture to be void—anything " herein contained to the contrary notwithstanding.

" Given under my hand and seal, this the 12th day of June, " A. D. 1844.

In the presence of          BENJ. F. HALSTEAD.  [L. S.]

" W. M. RANKIN,

" MAXWELL W. FIELD,

" H. F. STERNS."

The defendants, Fowler and Clepper, (now appellants,) in their original and amended answers, pleaded in substance, that they purchased the negroes in question from Halstead for a

valuable consideration; that he (Halstead) at the time, was the true and real owner of the negroes: and that the plaintiff had no right or title to them; that his pretended purchase at Sheriff's sale was under an execution issued upon a judgment fraudulently confessed without any consideration, and contrived and intended by the parties thereto, the plaintiff and the said Halstead, to cheat and defraud the creditors of the latter, who, at the time, was greatly indebteded; that the purchase was for the benefit of Halstead; and that the alleged conditional sale was without consideration, and was made with the intention of carrying out and consummating their former fraudulent sale in Alabama; that Halstead was in the possession of the negroes in Alabama before the Sheriff's sale, and remained in possession afterwards, in Alabama and Texas; that the Alabama Sheriff's bill of sale was never recorded as by the laws of Alabama it was required to be; and that for that reason also it was void; that the parties thereto had always treated the bill of sale as of no validity whatever, and the negroes in question, as remaining the property of Halstead. They aver that the said bill of sale of the slaves made in Alabama, and the alleged conditional sale made in Texas are fraudulent and void and confer no rights on the plaintiff; but if the last named instrument is of any validity, it can only be so as a mortgage: for that it was made and intended to secure the payment of certain sums of money therein specified. The defendants further allege that by reason of their purchase from Halstead, they became and were legally possessed of the negroes in controversy, and that the plaintiff, after the commencement of this suit, and on the 30th day of May, 1847, wrongfully and forcibly dispossessed them thereof, and detaines them; and that their hire during their detention has been of the value of two hundred dollars each; and they ask that in case the before mentioned instrument shall be held to be a mortgage, the hire of the negroes be deducted from the amount found to be due thereon; but if nothing be due, which they aver, that they have judgment therefor. The amended

answer containing these latter averments was filed on the 28th day of May, 1849.   The answer contains a detailed history of the transactions between the plaintiff and Halstead, commencing in Alabama, before the Sheriff's sale, under which the plaintiff claimed to have acquired the title to the negroes, and ending with the alleged conditional sale.   The defendants further pleaded in reconventien, damages for an alleged trespass committed by the plaintiff by wrongfully and forcibly dispossessing them of the negroes in controversy, on the 1st day of June, 1847.   This plea was filed in November, 1849.   There were other matters pleaded which it is not necessary to notice. The plaintiff excepted to the answer, as insufficient, in so far as it sought to impeach the plaintiff's title, on the ground that it was made and procured to defraud the creditors of Halstead; and also in so far as it sought to recover in reconvention, damages for the alleged trespass, for that the alleged trespass was barred before filing the plea in reconvention, and further that there was a former action pending between the parties, for the same alleged trespass.

It appears from a bill of exceptions in the record, that the Court sustained the exceptions and adjudged that " all and " every part of the original and amended answers of the said " Fowler and Clepper, which charge fraud and collusion, by " and between the plaintiff and the defendant Halstead, for " the purpose of delaying, hindering, or defrauding the credi- " tors of said Halstead, whether done in the state of Alabama, " or in Texas ; and all and every part of amended answer of " the defendants, Fowler and Clepper, filed on the 28th of " May, 1848, which avers a trespass on the part of the plain- " tiff, in taking the negroes in controversy, be stricken out, " and disallowed,"—leaving, as the Judge certifies, only the defences of " the general denial, and the plea that the plain- " tiff's claim is only a mortgage, and as such, asking an " account for hire since the negroes went into the plaintiff's " possession."   On these issues the case was submitted to the jury.

The plaintiff gave in evidence, first, the agreement or contract of sale between the plaintiff and Halstead, dated June 12th, 1844, and recorded the same day in the county of Montgomery. Second, a bill of sale from D. F. Henderson, Sheriff of Conccuch county, Alabama, dated Noverber 5th 1842.

The defendants gave in evidence a bill of sale from Halstead to themselves, dated on the 25th of October, 1845.

These were the written evidences of title relied on by the parties respectively; besides which there was a mass of testimony introduced by the parties in support of their respective sides of the issues, which it is not necessary to recapitulate. There was evidence offered by the defendants, of business transactions between Stoneum and Halstead, from a period anterior to the bill of sale in Alabama, down to the making of the instrument of the 12th of June, 1844, in Montgomery county, in this State, most of which was excluded by the Court. They offered in evidence a statement of accounts between Stoneum and Halstead, purporting to have been made on the 12th of June, 1844, showing items of indebtedness charged by the latter to the former, beginning anterior to the bill of sale in Alabama, and extending down to a period shortly before the making of this instrument of the 12th of June, 1844; and showing an indebtedness at that date, on the part of Halstead, of $5,585 18-100, and a final settlement, by a receipt in full. This evidence was rejected, on the ground that it was irrelevant. The defendants asked the Court to instruct the jury that the contract sued on, (of the 12th of June, 1844,) was, on its face, and in its legal import, a mortgage; which instruction the Court refused. There was a verdict and judgment for the plaintiff, and the defendants appealed.

*J. Sayles*, for appellants. I. That deeds and conveyances, to hinder, delay and defraud creditors, are void, admits of no question; they are so expressly declared by the statutes of Elizabeth, which have been in substance re-enacted in all the

States of the Union. "And the principles and the rules of "the Common Law, as now universally known and under-"stood, are so strong against fraud in every shape," says Lord Mansfield, (1 Cowper, 434,) "that the Common Law was cal-culated to attain every end proposed by the statutes." "The "genius of the Common Law of England opposes itself to "every species of fraud, so that nothing can have legal valid-"ity which has apparent fraud in its composition," and "All "statutes against fraud are simply declaratory of the Common "Law." (Roberts on Fraudulent Con., 1, 13, 15, 16.)

Though the Common Law abhorred fraud, and punished those guilty, it was found insufficient to prevent its perpetra-tion, in consequence of the great cunning and new devices of modern times, to effect which the Acts of Elizabeth were passed. (Rob. 520.) These Acts of Elizabeth are substan-tially re-enacted in the statute of frauds of Alabama and of this State.

Before the passage of the Acts of Elizabeth, there was some diversity of opinion as to the effect of a fraudulent deed, upon the rights of a subsequent purchaser or creditor; and the earliest decisions of the Courts, upon these statutes, favored voluntary conveyances, against creditors whose claims arose upon subsequent contracts; but a regard to the true intent of the statutes has led to a different construction. "It is not the "accomplishment of the deceit that constitutes the fraud, but "the deceitful intention manifested by his proceeding to the "second conveyance. Though the purchaser be not deceived, "a voluntary conveyance may still be fraudulent. And if so, "it is consequently void as against him, if he completes his "purchase." "By this avoidance of the first conveyance, "besides the protection of the purchaser, the statute has sec-"ondarily in view the punishment of the deceit." (Rob. 37.) "By thus considering the avoidance under the Statute 27 "Eliz., both as protective and suppliciary, and by regarding "the fraud as perfected in its essence, though unexecuted in "its object, by the voluntary conveyance made with intent to

"deceive, of which fraudulent intent the subsequent contract "is the proper evidence, we see the reason of the unimport-"ance of notice to the subsequent purchaser, who, if he has "knowledge of the conveyance, sees the fraudulent intent dis-"closed in the very treaty of sale, and has only to complete "his purchase, that by virtue of the valuable consideration, "he may become qualified under the statute to treat that as "void which he before perceived to be fraudulent." (Id. 39.)

"A voluntary conveyance is good, considered by itself, and "good against all but one who purchased for a consideration "of value; but when a purchaser of that description appears, "the first conveyance, coupled with the subsequent attempt "to sell for value, make up a compounded evidence of fraud-"ulent intention. The absurdity of making that fraud by *ex* "*post facto* circumstances, cannot with reason be objected. "Such objection is answered by the difference between making "and proving, for though an act which must be considered as "innocent, when committed, for want of evidence to the contra-"ry, cannot be made criminal by subsequent events, yet evi-"dence and presumption may well arise from subsequent events, "to annex a construction of guilt to that which stood free from "imputation at first." (Rob. 33.) "In looking a little more "inquisitively into the nature of this presumption of fraud, "or intent to deceive, as it arises upon these statutes, we are "led to observe that the fraud does not consist in the actual "deception of the purchaser or creditor, but in making a con-"veyance with a view to deceive or defraud them, which in-"tent to deceive or defraud cannot be manifest and determin-"ed until a purchaser or creditor arises: the whole then is "regarded as one transaction by relation, and the fraud in the "contemplation of the statutes, is then complete. This intent "to deceive is evident by a voluntary conveyance, coupled "with a subsequent agreement to sell the subject of that vol-"untary conveyance; and the fraud being complete in this "stage of the transaction, the purchaser may execute his bar-"gain notwithstanding he has notice of the former voluntary "conveyance." (Id. 35.)

Let us apply the reasoning of this learned author to the case at bar. Here was a voluntary conveyance, to defraud creditors; "for if it matters not, in this case, that it had assumed "the shape of a judgment of Court and an execution and pub-"lic sale. If the bond be voluntary, the judgment confessed "upon it, will likewise be voluntary." (Rob. on Fraudulent Con. 489.) The law will not permit its forms to be used to sanction illegal acts; that the stolen garb shall effectually conceal and protect the fraud sought to be covered up by it. Stoneum was a party to that fraud. To punish him and to effectually suppress such frauds in future, the conveyance is declared to be absolutely void. The appellants, knowing the conveyance to be fraudulent, by purchasing for a valuable consideration, acquired the right to treat it as void. Though they were not deceived, yet the sale was made with the view of deceiving and defrauding; it is that which it is the object of the law to prevent; it is the intention which renders the deed void. (Rob. 34, note 0, 52, 59.) "Actual fraud may be "shown by a creditor, although his debt accrued subsequent "to the conveyance sought to be avoided, even if it be a mere "right of action." (Rob. on Fraud. 49, note.)

This is the doctrine of American Courts. "Actual fraud "may be shown by a subsequent creditor." (3 Wendell, 411; 2 Bailey, 324; 3 Dev. 12; 4 Id. 197; 4 Yerger, 164; 1 State R. S. C. 521; 1 Dana, 532; 1 Hill, 303; 1 Mass. 165; 14 Id. 137; 20 Pinckney, 251; 14 Johns. 127; Smith's Lead. Cases, 43; Carter v. Castlebury, 5 Ala. 277; Long on Sales 125.) In the case of Ried v. Livingston (3 Johns. Ch. R. 481,) it is said that "a voluntary deed is void as to subsequent pur-"chasers, if there be any actual fraud between the parties to "the first deed." "Voluntary deeds or conveyances are void "as to all." (Long on Sales, 132, note.) The great question in 4 Johns. Ch. 456, is as to the existence of fraud in the transaction; "Is the deed fraudulent—if it is, whether the "creditors have any specific lien, is not material." "A vol-"untary deed is void as to subsequent purchasers, if there be

61

"shown any actual fraud between the parties to the first "deed." (4 Wash. C. C. R. 129.) "The possession of land "by the fraudulent grantee will not render invalid a title from "the fraudulent grantor to a subsequent purchaser, even with "a knowledge of the precedent conveyance." (14 Mass. 137.) "If a subsequent creditor can show fraud in fact, by showing "that the conveyance was made to avoid future debts about to "be contracted, or to defraud existing creditors, the convey- "ance is void, not only as to present, but as to subsequent cred- "itors." (Henry v. Fullerton, 13 S. & M. 634; Festner *et al.* v. Humphreys; U. S. Law Mag., vol. 10, No. 1 and 2, p. 82.) If the transactions in Alabama were fraudulent, and the sale void, no subsequent confirmation could purge the fraud, or give validity to the sale. "At the inception of a contract, "its character is stamped upon it; the subsequent proceedings "relate thereto; as if there be an absolute conveyance of "property, with a verbal promise to reconvey, and afterwards "a bond given to carry out the verbal promise of a subsequent "date; the bond has relation to the other." (Hilliard, 374– 376; note 6.) "If a deed is fraudulent, no subsequent ac- "knowledgment of its fairness would make it valid." (5 Greenleaf, 127.)

Fraud has ever been held so odious as to nullify everything it touches or is connected with. (2 Starkie, 339–40; 2 Coke R. 80, note; Story's Conflict of Laws, 449, note; 1 Johns. Ch. R. 405; 1 Vesey, 120, 284–9; 3 Coke, 94—Barwick's case; Story's Equity, Sec. 186.) "Fraud or Covin," says Lord Coke, "is a secret assent, determined in the hearts of "two or more, to the defrauding and prejudice of another," (Coke Lit. 337) "and the fraud avoids the contract *ab initio*." (3 Coke R. 77.)

The contract entered into between Halstead and Stoneum being fraudulent, no action can be brought upon it. (Cowper 343; Chitty on Con. 514.)

II.  Should it be decided by this Court that the contract, upon which suit is brought, is free from fraud, or that a sub-

sequent purchaser cannot, on that account, treat it as void, we then say that it is upon its face a mortgage, and that the plaintiff below was entitled to recover no more than his debt and interest.

The following are the characteristic features of the contract, from which it may be determined whether this instrument is a conditional sale of property, or a mortgage executed by Halstead in favor of Stoneum:

1st. It is signed by Halstead and not by Stoneum.

2nd. The validity, good faith and valuable consideration of the sale by the Sheriff of Conecuch county, Alabama, is acknowledged by Halstead, and said sale ratified and confirmed.

3rd. It is agreed that the property has been and is still to remain subject to the control of Stoneum, under certain restrictions.

4th. It is stipulated that Halstead is not to mortgage, sell, dispose of or carry away any of said property.

5th. It is stipulated that Halstead shall pay to Stoneum the sum of $5,585 18, with eight per cent interest, in four annual instalments, in which event Stoneum is to reconvey to Halstead said property.

6th. It is stipulated that if any of the property is lost, wasted, worn out, or dead, it shall be the loss of Halstead.

7th. It is agreed that the property shall remain in the possession of Halstead during the time specified; provided he shall make the payments punctually as they become due, and shall not remove the property from the county of Montgomery; but should he fail to make any of the payments, then Stoneum, or his agent, is authorized to sell, at public or private sale, so much of the property as shall be sufficient to meet said payment. And should he attempt to remove the property, then Stoneum, or his agent, is authorised to take it into possession, and the title is to remain absolute in said Stoneum.

It is the intention of modern Courts to construe instruments

to be mortgages, in all doubtful cases; and to prevent undue advantage being taken of the necessities of a debtor, instruments have been held to be mortgages, though the parties intended differently. (13 Mass. R. 309, 448; 16 Id. 116; 3 Pick. 211; 4 Id. 349; 4 Kent, 135, 7, 8, 9, 152–3 and note.) "If a transaction resolves itself into a security for a debt, "whatever may be its form, whatever name the parties may "give it, in equity, it is a mortgage." (3 Peters' Dig. 89, 53.) "A conveyance of real estate, intended merely as security for "a debt, though absolute on the face, is a mortgage; and any "agreement, on a subsequent event to change its nature, is "void." (7 Johns. Ch. R. 40; 2 Cowen, 246, 324; 9 Greenleaf, 241; 1 Wend. 433; 9 Id. 232; 6 Johns. Ch. R. 417; 1 Id. 167, 592; 4 Id. 167; Sup. Dig. to Johns. R. 424–5; 4 How. Miss. R. 323; 8 Yerger, 417; 10 Id. 380; 2 Johns. Ch. R. 189; 15 Id. 205; 2 Cowen 332; 1 Vernon 198; 2 Id. 402.) "Once a mortgage, always a mortgage." (1 Vernon, 7, Newcomb v. Bonham.) "Courts of Equity will lay "hold of all circumstances to ascertain whether the convey- "ance was intended as a security." (Powell on Mort. 120, 121.) "Courts of Equity lean against construing contracts "to be conditional sales. The *onus probandi* is on the de- "fendant. If it is doubtful, then it must be construed to be "a mortgage;" (Flagg v. Mann, 2 Sumner;) "and if it is a "mere security, it is a mortgage." (Ib.)

By reference to the instrument, we find a debt acknowledged to be due from Halstead to Stoneum, of $5,585 18. This, in no part of the instrument, is said to be the consideration of the conveyance, or the price of the negroes. This sum Halstead covenants to pay in annual instalments, and in default of any payment, sufficient of the property is to be sold to make it. Whose property is to be sold? If, as the appellee contends, this is a conditional sale, then the title of the property would vest in Stoneum. On failure to perform the conditions, Stoneum's property is to be sold to pay Halstead's debts. If the property is all sold to meet the first payment, the remain-

der of the debt still survives against Halstead : if the property dies, or is destroyed, the loss is Halstead's, though Stoneum is the owner.   " It is a true test, by which to determine " whether or not an instrument is a mortgage, to ascertain " whether there is a subsisting debt between the parties, capa- " ble of being enforced in any way, *in rem* or *in personam.*" (1 P. Will. R. 270, 271; 2 Id. 360; 1 Vesey, 406; 2 Atk. 496; 2 Bull & Beat. 278; 7 Cranch, 237.)   In this case, from the very terms of the instrument, there is a debt subsisting against Halstead, which could be enforced *in rem* or *in personam ;* and the debt still survives, though all of the property be destroyed.   By the terms of that instrument Stoneum, as the second payment fell due, could sue and obtain judgment against Halstead for the amount, although all of the property had been previously sold to make the first payment.   And further, should Halstead remove the property from the county in which it was situated, Stoneum was authorized to resume possession immediately.   The conditions were annulled, but the debt against Halstead still subsists.   Will the Court of equity enforce such a hard and unconcionable agreement as this—an agreement so entirely one-sided ?   Suppose Halstead has faithfully complied with all the conditions on his part—has punctually made the payments as they became due—what means does he possess to compel Stoneum to re-convey said property ?   None whatever; for this instrument is not signed by Stoneum.   Stoneum is not bound by it to do anything.   Do not all of these facts—the acknowledgment of a debt, the agree- ment to pay it, the stipulation that the property shall be sold in case of default, that the debt survives the loss or destruc- tion of the property, and that Halstead alone is bound by the contract—conclusively show that this instrument is a mort- gage, so intended by the parties ?   " Courts of equity do not " regard the form of an instrument, but look to the intent, " and give to the acts of the parties that construction which " is consistent with the intent and equity."   (2 Sumner, 533.)

A reference to the facts of the case will remove all doubt

from the minds of the most skeptical, as to the character of this contract.

As before stated there was a settlement. (This part of the brief is omitted.)

In this suit this instrument is treated by the appellee as a mortgage. In the petition for sequestration, the value of the negroes is sworn to be $6,218 55, being the principal of the debt with interest up to the date of filing the bill. "Bring-"ing the action as on a mortgage, is an evidence that such "was the original contract." (10 Pick. 303.) And "once a mortgage, always a mortgage," is a familiar legal maxim.

"The circumstance of the vendee not being let into pos-"session of the thing, shows it to be a mortgage." (3 Pet. Dig. 89, Sec. 81.) "And the change of possession is requir-"ed to be substantial and exclusive, and not concurrent with "the vendor." (2 Kent, 518.) Do not all of these facts show some secret trust, or understanding, that Halstead was to have his property again, when circumstances became more prosper-ous? The fact of Halstead acknowledging the Sheriff's bill of sale to be what it purports to be, and what the law says it must be, if the transactions were fair and honest, raises, of itself, a violent presumption, that during all this time, there was some secret trust and understanding between the parties, as expressed in this instrument.

The stipulation in this contract taking away the right of re-demption in any event, is wholly void. (1 Powell on Mort. 115, 116, and note, 119, 120 ; 2 Id. 122 ; Sup. Dig. Johns. R. 424.) And especially in the event of removing the pro-perty from a particular county. Such a contract is in contra-vention of the policy of the law. (3 Johns. Com. 147.)

We have thus, from the contemporaneous acts of the parties, endeavored to show the object of this contract; and in doing so, have, we think, fully disclosed their fraudulent intentions. "As fraud has become more dexterous, its views have become "more distant and less direct; and the prospective connection "between the original act and the ultimate purposes requires

" a longer course of deduction for its discovery and ascertain-
" ment." (Rob. 30.)

*B. C. Franklin* and *H. N. & M. M. Potter*, also, for ap-
pellants.

*P. W. Gray*, for appellee.   A voluntary conveyance, frau-
dulent as to creditors, is valid between the parties and all oth-
ers except the creditors.   They only can impeach it; and
hence such a deed is not absolutely void, but voidable. (Hart.
Dig. Art. 1452 ; 1 Story's Eq. Sec. 371, and authorities cited;
Curtis v. Price, 12 Vesey, 103 ; Worseley v. De Mattos, 1
Burr. 474 ; 1 Madd. Ch. 279-280 ; Jackson Dem. Molin v.
Gamsey, 16 Johns. R. 189 ; Sanverley v. Arden, 1 Johns.
Ch. 240 ; Bunn v. Winthrop, Id. 329 ; Drinkwater v. Drink-
water, 4 Mass. 354 ; Reichart v. Castator, 5 Binney, 109 ;
Sherk v. Endress, 3 Watts & Sergt. 255 ; Gillespie v. Gilles-
pie's heirs, 2 Bibb, 89 ; Dale v. Harrison, 4 Id. 65 ; Findley
v. Cooley, 1 Blackford, 263 ; Randall v. Phillips, 3 Mason,
370-88 ; Burgett v. Burgett, 1 Hammond, 469 ; Deniman v.
Radcliff, 5 Ala. 192 ; Rochelle v. Harrison, 8 Porter, 352 ;
Anderson v. Roberts, 18 Johns. 524, *et seq.*)

A subsequent purchaser with notice of a voluntary convey-
ance cannot avoid it, solely on the ground that it was volun-
tary.   In England the construction of the statute of 27 Eliza-
beth, in favor of purchasers, has been the contrary of this
proposition; but the doctrine has been adhered to more by
force of authority there than from reason.   (1 Story's Eq. Sec.
426 and notes ; Sugden on Vendors, 652-53 ; Cathcart v.
Robinson, 5 Peters, 265-79 ; Lancaster v. Dolan, 1 Rawle,
231 ; Foster v. Walton, 5 Watts, 378 ; Dougherty v. Jack, Id.
456 ; Speise v. McCoy, 6 Watts & Sergt. 485 ; Hudnall v.
Wilder, 4 McCord, 295-310 ; Moultrie v. Jennings, 2 Mc-
Millan, 508 ; Howard v. Williams, 1 Bailey, 575 ; Spencer,
J., in Sherry v. Arden, 12 Johns. 536-555, disagreeing with
Kent in S. C. 1 Johns. Ch. 261 ; Sanger v. Eastwood, 19

Wendell, 514; Bank of Alexandria v. Patton, 1 Robinson, Va. R. 500; McNeely v. Rucker, 6 Blackford, 391, and 2 U. S. Dig. Supt. p. 57; Hart. Dig. Art. 2776-7; Shaw v. Levy, 17 Sergt. & Rawle, 99-102; Tate v. Liggat, 2 Leigh, 84.)

Though a fraudulent conveyance may be avoided by a subsequent purchaser, yet where the fraud is intended only against creditors, it cannot be avoided by purchasers, on that ground. The fraud must be intended specifically against purchasers. (Foster v. Walton, 5 Watts, 378; Shaw v. Levy, 17 Sergt. & Rawle, 99-102; Douglass v. Dunlap, 10 Ohio, 162; Sanger v. Eastwood, 19 Wendell, 514; Bank of Alexandria v. Patton, 1 Robinson, 500-39; Teasdale v. Atkinson, 2 Brevard, 48; Woodman v. Bodfish, 25 Maine, (12 Sheply,) 317, or 1st Annual Digest, p. 284, Sec. 105.)

II. The contract between Stoneum and Halstead is not a mortgage, but an agreement for sale on conditions to be performed by vendee. (4 Kent, 143-44, and notes; Husey v. Thornton, 4 Mass. 405; Reed v. Upton, 20 Pick. 522; Gaither v. Teague, 4 Iredell, 65; Ellison v. Jones, Id. 48; Krœsen v. Seevers, 5 Leigh, 434; Bennett v. Sims, 1 Rice, 421; Dresser Man'g Co. v. Waterston, 3 Met. 9; Ervine v. Dalton, 6 Mumf. 231; Conway v. Alexander, 7 Cranch, 219.)

III. But admitting the contract to be a mortgage or deed of trust, all of the conditions had been broken, and the plaintiff had a right to recover possession. (Wolf v. O'Farrell, Cons. Court, S. C. R. 151; Ruch v. Hall, Douglass R. 22; Birch v. Wright, 1 Tenn. R. 382; Hopkins v. Thompson, 2 Porter, 433; Prescott v. Smyth, 1 McCord, 486; Newman v. Montgomery, 5 How. Miss. 742; Spaulding v. Scanland, 4 B. Mon. 365; Hundley v. Buckner, Sm. & Marsh, 70.) The breach of conditions not to sell or remove from the county, were such as equity would not relieve against. (2 Story's Equity, p. 554, Sec. 1323-24; 1 Smith's Lead. Cases, 79, notes.)

WHEELER, J. The record presents a multiplicity of rulings

and exceptions, which have been assigned as error. But the view we entertain of the principal questions in the case, which involve the merits of the controversy, and on which its ultimate decision must depend, will dispense with the necessity of considering all these various rulings, which relate to questions of practice and the admissibility of evidence, and will become immaterial, by our judgment on the merits.

The rulings of the Court, which it is deemed material to consider, are 1st. The striking out of certain portions of the defendants' answer; 2nd. The rejection of evidence offered by the defendants; and 3rd. The refusal of instructions asked by them.

1. The propriety of the ruling on the sufficiency of the answer, depends upon the inquiry, whether it was competent for the defendants, being, as appears by their answer, purchasers with notice of the alleged fraudulent conveyance from Halstead to Stoneum, to avoid that conveyance on the ground that it was made to defraud creditors. This involves an inquiry as to the true construction of the second Section of the Act to prevent frauds and fraudulent conveyances. (Hart. Dig. Art. 1452.) This statute embraces the substance of the 2nd Section of the statute of 13 Eliz. ch. 5 and 27 Eliz. ch. 4. It is proper, therefore, to consult the decisions of the English and American Courts, upon the construction of those statutes, in determining upon the construction to be given to our statute upon the same subject. By the statute of 13th Elizabeth, gifts of goods and chattels, made to defraud creditors, were rendered void as against the persons defrauded thereby. The statute of 27th Elizabeth was made to prevent fraudulent conveyances of lands, to defeat subsequent purchasers. (Rob. on Fraudulent Conveyances, Ch. 1, Sec. 1, n. a, b; 2 Kent, Com. 440.) Our statute embraces both objects. It declares that " Every gift, grant or " conveyance of lands, slaves, tenements, hereditaments, goods " or chattels," &c., made " to delay, hinder and defraud cred- " itors of their just and lawful actions, suits, debts," &c., " or to defraud or to deceive those who shall purchase the same

62

"lands, slaves," &c., "shall be deemed and taken only as "against the person or persons," &c., "whose debts, suits, de- "mands, estates, interests," shall or may be thereby "dis- "turbed, hindered, delayed or defrauded, to be clearly and ut- "terly void."

The statute thus protects the rights of creditors and subse- quent purchasers, as fully and effectually, and in very nearly in the same terms, as they were protected by the statutes of 13th and 27th Elizabeth; and it extends its protection to sub- sequent purchasers of slaves as well as of lands. In reference to the construction of the statute of 27th Elizabeth, Judge Story says, "It was for a long period of time, a much litigated "question in England, whether the effect of the statute was "to avoid all voluntary conveyances, (that is, all such as were "made merely in consideration of natural love and affection, "or were mere gifts,) although made *bona fide*, in favor "of all subsequent purchasers, with, or without notice: or "whether it applied only to conveyances made with a fraud- "ulent intent, and to purchasers without notice. After no "inconsiderable diversity of judicial opinion, (he adds) the "doctrine has, at length, been established in England, (whether "in conformity with the language or intent of the statute is "exceedingly questionable,) that all such conveyances are "void, as to subsequent purchasers with, or without notice, "although the original conveyance was *bona fide*, and with- "out the slightest admixture of intentional fraud; upon the "ground that the statute, in every such case, infers fraud, and "will not suffer the presumption to be gainsaid. The doc- "trine, however, has been admitted to be full of difficulties; "and it has been confirmed rather upon the pressure of au- "thorities, and the vast extent, to which titles have been ac- "quired and held under it, than upon any notion that it has "a firm foundation in reason and a just construction of the "statute. The rule, *stare decisis*, has been applied, to give "repose and security to titles fairly acquired, upon the "faith of judicial decisions. In America, (he adds,) a like

"diversity of judicial opinion has been exhibited.   Chancel-
"lor Kent has held the English doctrine obligatory, as the
"true result of the authorities.   But, at the same time, he is
"strongly inclined to the opinion, that, where the purchaser
"has had actual (and not merely constructive) notice, it ought
"not to prevail."   (1 Story, Eq. Sec. 426, 427.)

Since the case in which Chancellor Kent delivered the opin-
ion, referred to by Judge Story, the English doctrine has not
been followed to that extent in New York.   It was there op-
posed by the opinion of Chief Justice Spencer; the doctrine
of whose opinion has since been asserted in the Supreme Court
of that State.   (12 Johns. R. 536, 554 to 559; 4 Cowen, R.
603, 604; 8 Id. 406.)   The Supreme Court of the United
States, in the case of Cathcart v. Robinson, (5 Peters, R. 264,)
declined to adopt the then received English construction of
the statute.   The Court (Chief Justice Marshall delivering
their opinion) held, that the received construction of statutes
in England at the time they were adopted and admitted to op-
erate in this country, and up to the time of our separation from
England, might very properly be considered as accompany-
ing the statutes themselves and forming an integral part of
them; but that, however they might respect subsequent deci-
sions, the Court did not admit their absolute authority.   They,
therefore, adopted the construction of the statute which pre-
vailed at the American Revolution; which, they held, went
thus far, that, "A subsequent sale, without notice, by a per-
"son who had made a settlement, not on a valuable consid-
"eration, was presumptive evidence of fraud; which threw
"on the party claiming under the settlement the burden of
"proving, that it was made *bona fide*."   (Id. 280, 281.)

It seems that the rigorous doctrine at that time understood
to be the established construction at Westminster Hall; and as
stated in the text quoted from Story, has been since relaxed
by the English Courts.   (2 Kent, Com. 5th Am. Edit. 241,
n. c.)   And it is believed that this doctrine, that a subsequent
sale for a valuable consideration, by a person who had made

a voluntary conveyance, is conclusive evidence that the former conveyance was fraudulent, and void even as to a purchaser with notice, has not been adopted generally by the American Courts; but that the better American doctrine is, that such subsequent sale is only *prima facie* evidence, which may be rebutted by showing that the former conveyance was made in good faith, and not intentionally to defraud. · (4 Kent, Comm. 464, n. d; 2 Id. 440 to 442 and notes; 1 Sm. L. Cases, 1, Am. Notes to "Twyne's Case;" 1 Story's Eq. Ch. 7.) And this accords with the doctrines maintained by this Court in the case of Bryan v. Kelton. (1 Tex. R. 415.)

In the conflict of judicial opinion, we feel free to adopt that construction which seems to us best to comport with the true intent and meaning of the statute. For, whatever force there may be in the reason assigned for adhering, in England, to their received construction of the statute, that, to depart from it, would be, to unsettle the rights of property, and disturb the repose of society, that reason has no application here.

We have not the same reason to adhere to any particular course of decisions, which has constrained the English Courts to apply to their decisions the maxim, *stare decisis*.

But it is unnecessary, at present, to enter upon a review of the decisions, in order to ascertain what is the better opinion upon the construction of the statute; or what should be held to be its effect upon voluntary conveyances generally, in reference to subsequent purchasers. We are, at present, only concerned with the question, whether a conveyance, intended to defraud creditors, is to be held to be void, under the statute, as to subsequent purchasers, with actual notice of the prior fraudulent conveyance. Upon this question, the English doctrine, and that of some of the American Courts, seem · to be, that such a conveyance is void as to subsequent *bona fide* purchasers, that is, (it is said,) purchasers, strictly and properly so called, whether with or without notice. (1 Story Eq. Sec. 433, n. 2; Twyne's case, in 1 Sm. L. Cases, 1, and notes; 4 Kent Com. 463.) But this doctrine as to purchasers

with notice, appears to be founded on the supposition, that a conveyance made intentionally to defraud, is, to all intents and purposes, absolutely void, and, consequently, a nullity. This being assumed, it follows, of course, that it is immaterial whether the subsequent purchaser had notice of it or not: for if he knew of its existence, he also knew, it may be said, that it was void; and no one is obliged to respect a thing which is, to every intent, and as to all persons, utterly and absolutely void. But this is not the case of (with) a fraudulent conveyance. It is valid and binding as between the parties and their legal representatives. "Although," (says Story, 1 Eq, Sec. 371,) "voluntary conveyances are, or may be, void, as to " existing creditors, they are perfect and effectual, as between " the parties, and cannot be set aside by the grantor, if he should " become dissatisfied with the transaction. It is his own folly " to have made such a conveyance. They are not only valid " as to the grantor, but also as to his heirs, and all other per- " sons claiming under him, in privity of estate, with notice of " the fraud. A conveyance of this sort, (it has been said, " with great truth and force,) is void only as against creditors ; " and then only to the extent, in which it may be necessary " to deal with the conveyed estate for their satisfaction. To " this extent, and to this only, it is treated, as if it had not " been made. To every other purpose it is good. Satisfy the " creditors, and the conveyance stands." (Ib.; 12 Vesey, 103.)

Such a conveyance vests in the grantee a good and perfect title, defeasible only at the instance of the person, to whose prejudice it has operated. "It is now the settled American " doctrine, that a *bona fide* purchaser for a valuable consider- " ation, is protected under the statutes of 13 and 27 Eliz., as " adopted in this country, whether he purchases from a frau- " dulent grantor or a fraudulent grantee." (4 Kent, 464.) But if the conveyance was absolutely void, the fraudulent grantee could convey no title; for none would vest in him; and the fraudulent grantor could reclaim his property notwithstanding the conveyance.

That such a conveyance is not absolutely void, but is valid and effectual to vest a title in the grantee; and the distinction between things void and voidable only, are very clearly and forcibly illustrated by Chief Justice Spencer, in the case of Anderson v. Roberts. (18 Johns. R. 515, 527-8.) "In my judgment," (he said,) "the error of those who assert, that a fraudulent " grantee, under the 13th of Eliz., takes no estate, because the " deed is declared to be utterly void, consists in not correctly " discriminating between a deed which is an absolute nullity, " and one which is voidable only. No deed can be pronounc-" ed, in a legal sense, utterly void, which is valid as to some " persons, but may be avoided at the election of others. In " Lilly's Abr. 807, and Bac. Abr. Tit. VOID AND VOIDABLE, " we have the true distinction. A thing is void which is done " against law, at the very time of doing it, and where no per-" son is bound by the act; but a thing is voidable, which is " done by a person who ought not to have done it, but who, " nevertheless, cannot avoid it himself, after it is done. Ba-" con classes under the head of acts which are absolutely void " to all purposes, the bond of a *feme covert*, an infant, and a " person *non compos mentis* after an office found, and bonds " given for the performance of illegal acts. He considers a " fraudulent gift void as to some persons only, and says it " is good as to the donor, and void as to the creditors. When-" ever the act done takes effect as to some purposes, and is " void as to persons who have an interest in impeaching it, " the act is not a nullity, and therefore, in a legal sense, is not " utterly void, but merely voidable. Another test of a void " act or deed is, that every stranger may take advantage of it, " but not of a voidable one. (2 Leo. 218; Viner., Tit. VOID " AND VOIDABLE, A. p. 11.) Again, a thing may be void in " several degrees : 1st, void as if never done, to all purposes, " so as all persons may take adventage thereof; 2nd, void " to some purposes only; 3rd, so void by operation of law, " that he that will have the benefit of it, may make it good. " (Viner., Tit VOID AND VOIDABLE, A. p. 18.) In Prigg v.

" Adams, (2 Salk. 674,) the defendant justified as an officer,
" under a *ca. sa.*, on a judgment in the common pleas, upon a
" verdict of 5s., for a cause of action arising at Bristol.   The
" plaintiff replied the private Act of Parliament, for erect-
" ing the Court of Conscience in Bristol, wherein was a clause,
" that if any person bring such action in any of the Courts at
" Westminster, and it appeared upon trial to be under 40s.,
" no judgment should be entered for the plaintiff; and that,
" if it be entered, it shall be void.   Upon demurrer the ques-
" tion was, whether the judgment was so far void, that the
" party should take advantage of it in this collateral action.
" The Court held that is was not void, but voidable only by
" plea or writ of error.   Upon authority, therefore, I insist,
" that the expressions in the statutes of 13th and 27th Eliz.,
" that conveyances, in contravention of those statutes, shall be
" deemed utterly void, &c., must necessarily be construed, as
" voidable by the party agrieved."

It has been, I apprehend, from not keeping in view this dis-
tinction, between a deed which is void, and one which is void-
able only, that the opinion has prevailed to some extent, that
a conveyance that is fraudulent, and therefore declared to be
utterly void by the statute, is so even as to a subsequent pur-
chaser with notice.   It is difficult to conceive of any other
principle, on which such an opinion could ever have obtain-
ed.   There is nothing in the language of the statute, nor is
there any general principle of law, which would seem to sanc-
tion such a doctrine.   On the contrary, the language and de-
clared object of the statute would naturally lead to the con-
clusion that it was intended to afford protection only to cred-
itors and *bona fide* purchasers , and such is the language gen-
erally, of the books.   But how can one be said to be a pur-
chaser in good faith, who purchases, knowingly and intention-
ally to defeat the previously' acquired title of another ?   In
Sanger v. Eastwood, it was said by the Supreme Court of
New York, that a purchaser with notice cannot claim to be a
purchaser in good faith.   "Clear (actual) notice of a prior

" claim," (it was said,) " is considered *per se* evidence of *mala* "*fides*." Proof of such a fact ought rather to prejudice than advance the claims of a purchaser. (19 Wend. 515.) The general principle of law unquestionably is, that a purchaser with notice, takes the estate of his grantor, and no more. He acquires only such title as the latter had to convey; and he can stand in no better condition, in a Court of Equity. An innocent purchaser, without notice, is protected upon a different principle, from the supposed nullity of the grantor's prior conveyance.

But the doctrine that the purchaser with notice can avoid the prior conveyance is not universally admitted. There is high authority opposed to it. The Supreme Court of Pennsylvania, in the case of Foster v. Walton, (5 Watts, 478,) determined the contrary, on principle, and upon reasons which seem unanswerable. They decided that, although a conveyance of land may be fraudulent and void as to creditors, by virtue of the statute of 13th Elizabeth, yet, under that statute, none but creditors can avoid the deed; and that the statute of 27th Elizabeth, does not afford a protection to a purchaser with notice of such prior conveyance. That was an action of ejectment in which both parties claimed under deeds from one Register; Walton, by a subsequent conveyance, but with a knowledge of the prior deed to the plaintiff, Register; which, he sought to avoid on the ground that it was made to defraud creditors. On the construction of the statute of 27 Eliz., as to its application to such a case, the Court said : " If at the " time he, (the defendant,) bought the land of Register, or " even before he paid his money for it, he was apprised, as " the evidence would seem to show he was fully, of the previ- " ous conveyance of the land by Register to the plaintiff, then, " according to the construction put on this latter statute, and " the principles laid down by this Court in Lancaster v. Do- " lan, the defendant has no claim to protection under it as a " purchaser." This case was decided after a very able and full discussion of the construction which ought to be given to

this statute, and is now considered as having settled the law, on this point, in Pennsylvania. The Chief Justice, in delivering the opinion of the Court in it, shows by a course of reasoning, and by language that cannot be resisted, or easily forgotten, the injustice and iniquity that would necessarily follow from permitting a voluntary grantor to defeat his own conveyance, by making a subsequent sale of the land, because he is paid for it. He says, (1 Rawle, 246,) " It is admitted that a " voluntary conveyance is good between the parties; and it is " a common principle of equity, that an assignee with notice, " must abide by the case of the assignor. But the pretended " equity of a subsequent purchaser with notice, even as against " a volunteer, would spring from an act, the consequence and " design of which would be to enable the donor to cheat the " donee. The purchase would be an act of collusion, and all " the fraud would be on the side of the purchaser." " If the " defendant in the present case had notice of the plaintiff's con- " veyance at the time he bought, or before he paid his money, " there seems to be no circumstance which he can lay hold of, " that would seem to relieve him from the imputation of fraud, " which is so clearly shown here by the Chief Justice, to exist " in such a case, on the side of the subsequent purchaser. It " certainly cannot be considered a sufficient apology and justi- " fication for him, having full notice, that he purchased, because " the plaintiff had joined with Register in taking a conveyance " from the latter for the purpose of defrauding his creditors. It " is only the party who is likely to be injured by such convey- " ance that can claim to have it annulled ; but if he does not " choose to stir in the matter, why should any other be permit- " ted to interfere ? Surely no good can result from it. The " peace and well being of the community is not affected by the " act, so as to make it a public offence ; and therefore, to permit " a person who has no concern in the matter, to take the land " from the party to whom it has been conveyed by the most " solemn, wilful and deliberate act of the owner ; and in effect, " against the will of the grantee, to give it back in whole, or in

63

" part, again to the grantor, by paying him its full or half value,
" would be introducing a very extraordinary principle into our
" jurisprudence, for regulating and transferring the rights of in-
" dividuals. If such an interference were sanctioned, it would
" be productive of a new source, and continual state of strife
" and litigation. Besides the deed from Register to the plaintiff,
" being admitted by the Court below, and by every one, to be
" perfectly good and binding, as between the parties to it, to
" permit the grantor, by selling the land to one with notice, to
" set it aside, would involve the strange anomalism of enabling
" him to do by indirect means what he is prohibited from effect-
" ing directly. It may also be remarked that to permit this to
" be done, would be in contradiction to every principle of
" public policy, which makes the act of the fraudulent grantor
" binding upon him, so far as he or his representatives are con-
" cerned, with a view to deter from and discourage such fraudu-
" lent acts. But if he can sell the land to whom he pleases, he
" is in effect the owner of it still, and has forfeited, or lost noth-
" ing by his fraudulent conduct. The law, however, has no such
" regard for him as to enable him, either directly, or indirectly,
" to annul his own conveyance, though fraudulent, with a view
" to promote his interest; and it is only where he has afterwards
" sold and conveyed the land to an innocent purchaser without
" notice, for a valuable consideration, that the law will interpose
" and set the voluntary, or fraudulent conveyance aside, in order
" to prevent a loss from falling on such innocent purchaser.
" It is, therefore, out of regard to this latter, and not the gran-
" tor, that the law deals thus with the fraudulent conveyance."
(5 Watts, 380, 381.)

To this reasoning there is no answer in any authority to
which we have had reference: and it seems to us, that to admit
the opposite doctrine, would be to hold out a powerful motive
and inducement to the practicing of those frauds which it was
the object and intention of the statute to prevent; and would
thus defeat the great purposes of public policy in which it had
its origin.

We therefore conclude that the defendants, being purchasers with actual notice of the prior conveyance, are not protected by the statute: and that the Court did not err in adjudging the answer, in so far as it sought to avoid that conveyance on the ground that it was fraudulent as to creditors, insufficient.

The question we have now been considering was decided by this Court in the case of McClenny v. Floyd. (10 Tex. R. 159.) That case, however, was decided without argument upon this point; and, at a time, when the presure of business afforded little opportunity to examine the authorities. It has been fully argued in the present case, and its importance, and the attention bestowed upon it by counsel, have seemed to require a more critical examination; which has resulted in confirming us in our former opinion.

In the case referred to, the conveyance from McClenny was treated as fraudulent. But it was immaterial, as to the parties then before the Court, whether it was fraudulent, or merely voluntary. In either case it was binding and effectual to pass the title as between the parties; as the authorities, to which we have referred, abundantly show.

2. The principal question before the jury, upon the issues in the present case, was, as to the character of the instrument of the 12th of June, 1844, whether it was a mortgage or not. The Court held that it was not, upon its face, a mortgage. If it was not a mortgage on its face, but was, in form, a conditional, or an absolute sale, it is too well settled to admit of a question, that parol evidence was admissible to show that it was, in fact, intended as a security for a subsisting indebtedness on the part of the grantor, and was, consequently, in substance, a mortgage. How, then, it can be supposed that the evidence, offered to prove such indebtedness, was irrelevant; or what good reason there could be for the exclusion of evidence, by which it was proposed to show, that at the date of the instrument, there was a settlement of accounts between the parties and an ascertained, antecedent indebtedness on the part of the maker, of the identical sum stipulated by the in-

strument to be paid by him, it is not easy to perceive. This was proposing to prove the fact, which is universally admitted to be the principal test, to determine whether the instrument was a mortgage or not. (Stamper v. Johnson, 3 Tex. R. 1; Stevens v. Sherrod, 6 Id. 294, and authorities there cited.) If this testimony had been admitted, it is scarcely possible to conceive that any mind could have resisted the conclusion, that the instrument was really given and intended as a security for the payment of money; and was, necessarily, a mortgage. It would seem, therefore, that there was error in excluding the evidence.

But the ruling upon this question becomes unimportant, in the view we entertain of the remaining question, upon the true import and character of the instrument itself.

3. It remains to inquire whether the ruling, upon instructions asked by the defendants, that the instrument of the 12th of June, 1844, was not, on its face, and in effect, a mortgage, was correct. And, to determine this question, it is essential to ascertain what was the true character of the instrument, and, if in our legal nomenclature, it has a place and name, to ascertain what is its distinctive character and appropriate name.

It may be the most convenient method of arriving at a satisfactory conclusion on this point, in the first place, to see what it is not. We may premise, that it must be either an absolute or conditional bill of sale, a contract to sell or convey, or a mortgage. Our legal vocabulary affords no other specific designation by which it may be supposed to be appropriately characterized.

It has not been, nor can it be, pretended that it is an absolute bill of sale. Its terms, and several stipulated conditions, import the contrary. It is not a conditional sale; for it does not presently pass the title: whereas a conditional sale passes the title to the vendee, in the first instance, with the reservation to the vendor of a right, to repurchase the property, at a fixed price, and specified time. (7 Cranch, 218; Luckett

v. Townsend, 3 Tex. R. 119; Thompson v. Chumney, 8 Id. 389.) It is not a bill of sale, absolute or conditional from the plaintiff to Halstead; for it does not pass, or profess to pass the title to the latter. On the contrary, it declares that the title is, and is to remain in the former. Neither is it, by its terms, or in form, a sale from Halstead to the plaintiff: for it declares that the title theretofore had been and was in the latter. Not being a conveyance in form, it cannot be made such by extrinsic evidence. Parol evidence is admissible to show that a deed, or bill of sale absolute, or conditional on its face, is a mortgage; but not *e converso*. (6 Watts, 130.) If an instrument does not contain the essential requisites of a conveyance, valid and effectual, in itself, to pass the title, it cannot be made so by extrinsic evidence. In fine, it evidently is not, in form or substance, either an absolute, or conditional sale. It does not purport to be a sale, or pass, or profess, *per se* to pass the title; and, therefore, it is not, and cannot be a conditional sale. In form it is a contract on the part of the plaintiff, to convey the property to Halstead, upon the performance of certain conditions, or stipulations, thereafter to be performed by the latter. But so regarded, being an executory contract for the sale of slaves, it would seem to be subject to the objection, that it comes within the operation of the first Section of the statute of frauds, and was not obligatory upon the plaintiff, because not signed by him. But, that this is not, really and truly, the character of the instrument, in fact and substance, will be apparent by attending to one or two of its stipulations and provisions. It stipulates for the payment, by Halstead to Stoneum, of a sum of money, in annual instalménts; and it further stipulates, that the negroes shall remain in the possession of Halstead during the time specified for the payment of the money; but should he (Halstead) fail punctually to pay Stoneum, his heirs, executors, administrators or assigns, the several sums of money therein specified, then Stoneum, and in his absence, his agents, shall sell so much of the property, at public, or private sale, at their option, as will meet the payments accord-

ing to the tenor of the instrument.  And it is further stipu-
lated, that, should any of the negroes die, in the meantime,
the loss shall be Halstead's.

These stipulations, it seems to us, fix the character of the
instrument beyond a reasonable doubt.  It is impossible to be-
lieve that any sane man would stipulate for the privilege of
selling his own property to pay a debt due himself from an-
other.  It is not to be supposed that any man in his senses,
(and it is not pretended that the plaintiff was insane,) would
become a party to such an agreement.  It admits of no ration-
al interpretation upon any other supposition, than that the
title to the property, notwithstanding the declarations in the
instrument to the contrary, was, in fact, in Halstead, within
the mutual, though private understanding and knowledge of
the parties ; and that the real intention of the instrument was
to give a lien upon it, to secure the payment of a debt due by
him to Stoneum.  It is plainly inconsistent with any other
supposition.  If it had been a conditional sale from Stoneum
to Halstead, or a contract to sell upon conditions to be per-
formed by the latter ; upon breach or failure of the conditions,
the former would have been entitled to his property absolute-
ly, discharged of the conditions ; and there would have been
no reason, or propriety, in his stipulating, himself to perform
the condition, of which he alone could require the perform-
ance, by the sale of his own property.  And the further stip-
ulation, that, in case of the death of any of the negroes, the
loss should be Halstead's, is inconsistent with the idea that
they were the property of Stoneum.  There doubtless was,
for some reason, known to the parties, but which they have
not disclosed by the instrument, a secret trust and confidence
subsisting between them, and a mutual understanding that
the property, though really Halstead's, should be held out to
the world as belonging to Stoneum ; and hence they resorted
to the contrivance of this novel instrument, to avoid a dis-
closure of the true state of the case.  But the instrument it-
self furnishes indisputable evidence of its real character, not-

withstanding the efforts of the parties, by their recitals and declarations, to conceal it. It evidently was, in fact and substance, a mere security; and the law is, that where the instrument is, in substance, a security for the payment of money, no management or contrivance of the parties, no form or expression in the instrument, will avail to change its real character and effect.

We can entertain no doubt of the real character of the present instrument. But if it were doubtful whether the parties intended a mortgage or a conditional sale, a Court of Equity would incline to consider the transaction a mortgage, as more benign in its operation.

Applying, therefore, to this instrument, the established rules of construction, applicable in such a case, to ascertain whether it is a mortgage or not, which have been too often considered by this Court, and are too familiar to require repetition here we conclude that it must be held, by its stipulations and provisions, to be, in effect and on its face, a mortgage; and that the Court erred in refusing so to instruct the jury.

The petition was framed with a double aspect: asserting a title to the property absolutely, under the contract as a conditional sale discharged of its conditions; and in the alternative, as a mortgage. The recovery was upon the former aspect of the case. This, in the view we have taken, was error. But the plaintiff was entitled to maintain his action, in the other aspect of the case, for the foreclosure of the mortgage; and under the prayer for general relief, the appropriate relief might have been administered. But for the better presentation of the merits of his case, it may become necessary for the plaintiff to amend his petition. It contains no averment of the value of the property. And though the Court refused to entertain the demurrer, because the defendant had answered to the merits, the omission of the averment might have become embarrassing to the plaintiff on the trial. This Court has often held, that exceptions to the legal sufficiency of the petition, in the due order of pleading, should, in general, precede the

answer to the merits. But we have never decided, that exceptions, which go to the merits and foundation of the action, cannot be entertained after an answer to the merits. It would be idle to compel a defendant to proceed to trial, and drive him to his motion in arrest of judgment, upon a petition so defective as that, judgment could not be rendered upon it.

The ruling of the Court upon the plea in reconvention was correct, for the reason that the matters pleaded were, at the time of pleading them, barred by the statute of limitations. No damages were claimed for the alleged trespass, complained of in the amended answer, filed on the 28th of May, 1849, and referred to by that date in the bill of exceptions; but hire only was claimed for the use of the property, after it came into the possession of the plaintiff; and the ruling of the Court did not deprive the defendants of the benefit of the claim for hire. The reference in the bill of exception, therefore, to this amended answer was, doubtless, a mistake. It should have been to the plea in reconvention, filed in November, 1849; which, for the reason before stated, was rightly adjudged insufficient.

There are other questions presented by the record, the consideration of which, however, may be dispensed with, as their determination is not essential to the present disposition and ultimate decision of the case. The judgment is reversed, and the cause remanded for further proceedings.

Reversed and remanded.