Lewis v. Castleman.

---

C. D. Lewis and wife v. Jacob Castleman.

Early in 1840 A., with the intent to defraud his creditors, executed a conveyance of slaves to B., who then had them in possession under hire; which conveyance was never recorded. Soon thereafter B. executed to the minor daughter of A., who resided with A., a deed of gift of the slaves, and delivered possession of them to A. for his said daughter, the deed of gift being then recorded in Harris county, where all the parties then lived. Within the same year, 1840, A. removed to Fayette county, bringing the slaves with him, and holding them in possession there until 1857, when he sold one of them to .: Held, that neither the second nor third clause of the second section of the statute of frauds was applicable to the case; but that under the first clause of said section the conveyance to the daughter of A. was void as against C., provided he was a bona fide purchaser for value without notice; and that the record of the deed in Harris county was not notice to C., who, as well as A. and his daughter, resided in Fayette county, wherein the deed of gift had never been recorded.

Held, further, that although the delivery of the negroes by B. to A. vested the possession in A.'s daughter, in contemplation of law, yet as the negroes remained under the control of A., and were used by him in apparent right of ownership, C., the purchaser, was not chargeable with notice of her title by reason of such possession acquired through her father.

C., the purchaser from A. under the foregoing circumstances, brought suit against A.'s daughter and her husband to recover the negro sold to him by A.: Held, that conceding he had no notice, actual or constructive, of the conveyances aforesaid, it was still incumbent on him to prove that he had paid the purchase money; and in default of such proof, the verdict in his favor should have been set aside, and a new trial granted to the defendants. The recital in his bill of sale is not, it seems, sufficient evidence of payment of the consideration to sustain the verdict.

See this case for an exposition of the second section of the statute of frauds, with reference to the applicability of its three several clauses to the facts of this cause.

Under the circumstances above set out, the possession of the negroes by A., being in a fiduciary capacity, as natural guardian of his daughter, there must have been a distinct and unequivocal repudiation of her title by him, brought home to her knowledge, before the statute of limitations would commence to run against her; and such repudiation, it seems, must have been persisted in throughout the term of prescription, or she would not be barred. · Equivocal acts or declarations by A., in denial or recognition of her right to the negroes—such as occasionally denying her title to them, and offering to sell them as his own, and then, again, disavowing any claim to them as his, and acknowledging her title—would not be such a repudiation of her title as would make his possession adverse and support the statute of limitations against her.

An estoppel must operate mutually between the parties; and before an act can have the effect of an estoppel *in pais*, it must have been acted upon by the party relying upon it. See the facts of this case for declarations made in a private letter, with reference to the property in controversy, which are held insufficient to estop the defendants from maintaining their title to it; and which, being made without consideration, could not operate as a relinquishment of title.

Note the charges given by the court below and held by this court to be a correct exposition of the law of this case, arising out of the statutes of frauds and limitations, and otherwise.

APPEAL from Fayette.    Tried below before the Hon. George W. Smith.

This suit was brought by the appellee, on the 29th of January, 1857, to recover from the appellants, Charles D. Lewis and Leonora, his wife, a negro boy named Burrill and his hires.

The title set up by the defendants to the slave in controversy is clearly explained in the opinion of the court, and was explicitly pleaded by the defendants in their answer.

The plaintiff, by amended petition, denied the execution of any conveyance by Warren J. Hill, the father of the defendant, Leonora, to George R. Carradine, and alleged that if such a conveyance was ever executed it was without consideration, and with a design to defraud the creditors of Hill, and was consequently void. Plaintiff alleged that the boy Burrill, and the other slaves so pretended to be conveyed, remained in the possession of said

Hill, and that the supposed conveyances were never recorded in the county of Fayette, where Hill resided with the slaves; that he, the plaintiff, was a creditor of said Hill to the amount of $800, money loaned him on or about the 1st of January, 1855, in the faith that said Hill was the owner of the negroes in question, for the security of which loan the said Hill mortgaged to the plaintiff a negro named John; that afterwards, on or about the 26th of January, 1857, the plaintiff purchased the boy Burrill from said Hill at the price of one thousand dollars, paid in the indebtedness and mortgage aforesaid, and the balance in money; and plaintiff distinctly alleged that he paid all of said purchase money before he ever received any notice of the pretended claim of the defendant, Leonora, and that he was an innocent purchaser for a valuable consideration and without notice; and avers that if the said conveyances were ever made, as alleged by defendants, they were fraudulent and void as to plaintiff; and he pleads that he and Warren J. Hill, under whom he claims, had held peaceable adverse possession of the slave Burrill for more than two years before the defendant obtained possession of said slave.

By another amendment, the plaintiff alleged that long before his purchase of the negro, the defendant Leonora had, by a certain letter addressed to Mrs. Eliza S. Hill, disclaimed any interest whatever in the said negro, and acknowledged that her claim was only nominal, whereby she was estopped from denying the claim of the plaintiff. The letter referred to, which bore no date, was exhibited by plaintiff with this amendment, and is as follows:

"*Dear Eliza:*

"I am truly grieved to hear this painful news. You had talked to me before of Nich's doing this, but I could not believe it. It is bad indeed, but I hope it will not turn out so badly as you think. I have been staying several days with Mrs. Sinks. Ann, Maria and herself are helping me get ready. If I could have done so, I should have gone over home ere this, but I have not had one leisure moment. Tell Pa that I ever will be mindful of his interests; that they may all forsake him and turn against him, but I never will. I have confidence in you, Eliza, that you

know; but do you blame me for having more in myself? Is'nt it human nature? I know my feelings towards Pa exactly; and he knows that my claim upon those negroes is merely nominal; that they are his, and his they shall remain. The Bible says: ' love thy father that thy days may be long in the land the Lord thy God giveth thee.' I have endeavored to keep the commandment, and Pa never will live to say that his little daughter he loved so well, long, long ago, robbed him of the last cent. I hope you will not think hard of me, but those negroes are Pa's, and never (will) be placed at any one else's disposal. No one can take them from him as they now stand, and he knows well enough that I will never claim them, and I intend to talk to Albert, and do all that is in my power to prevent him from attempting to take those negroes. I will come over as soon as I can. Remember me always to be your true friend.

  (Signed)          " LEONORA."

Addressed to " Mrs. Eliza S. Hill, at home."

By amended answer, the defendants denied any disclaimer of title by means of the letter to Mrs. Hill; allege that said letter was written subsequent to the institution of this suit, and that it had no reference to the boy Burrill in controversy; denied that at the time the plaintiff purchased the boy of Warren J. Hill, either of them had ever seen or heard of said letter, or acted thereupon; averred that at the date of said purchase, January 26, 1857, and for a long time before as well as ever since that date, the said slave had been continuously in possession of these defendants as the separate property of said Leonora, and that the plaintiff at said date knew that said slave was then and long had been in their possession. Defendants further alleged that the letter in question had reference to certain other negroes which had been in litigation between Warren J. Hill and Nicholas Franklin, who was referred to in said letter as " Nich;" and to other negroes in litigation between said Warren J. Hill and Albert G. Hill, who is also referred to in said letter by his given name. And defendants deny that Warren J. Hill ever claimed to hold the boy Burrill adversely to said Leonora; and aver, on the contrary, that ever

since the birth of said boy, in 1842, the said W. J. Hill, though controlling and managing said boy and other negroes for Leonora, his daughter, had always acknowledged her right and title thereto, and that her title was and had long been notorious in the neighborhood; of all which facts the plaintiff, before his purchase, had notice.

This cause came to trial at the Fall Term, 1859, and numerous witnesses were introduced on both sides, with reference to the character of W. J. Hill's possession of the negroes, and of his acts and declarations with reference thereto. The substance of this evidence is summed up in the opinion of the court. The plaintiff put in evidence his bill of sale for the boy in controversy, from Warren J. Hill, dated January 26, 1857, and acknowledged for record two days afterwards. This instrument purported to be made in consideration of one thousand dollars " in hand paid," and a witness for the plaintiff testified that on or about the date of the bill of sale, he loaned to the plaintiff two hundred dollars to make up a sufficient amount to purchase the negro Burrill from W. J. Hill; that the plaintiff brought the negro home with him, and that night the negro ran off from plaintiff's house, but next day was found by plaintiff and witness at the house of defendants, in Fayette county. On cross-examination, this witness said he knew nothing of the payment of the purchase money by the plaintiff of his own knowledge, further than the loan already stated, which plaintiff said was for the purpose of completing the payment.

A number of special issues upon the controverted facts of the case were submitted to the jury, the most material of which issues are sufficiently indicated by the charges given to the jury by the court below, which were as follows :

" In reference to the 3d issue, you are charged that if W. J. Hill transferred the woman Hannah (the mother of the boy sued for,) to Carradine for the purpose of hindering, delaying, or embarrassing his then creditors, and that Carradine knew his object, then you should find this issue in the affirmative; and, further, if he were in failing circumstances, and transferred the negro to Carradine without proof of anything having been paid, and Carradine

made a deed of gift to the daughter of said W. J. Hill, *prima facie*, the whole matter should be held to be fraudulent.

"4th Issue. Upon the 4th issue you are charged that if W. J. Hill transferred the woman to Carradine, and he made a deed of gift for her to Leonora Hill, who was the minor child of W. J. Hill residing in the family with him, and that Carradine delivered the negroes and title papers to him for her, then it would be a presumption of law that Hannah and her child, if under the control of W. J. Hill, were still in the possession of Leonora, that is so long as she remained one of his family; for it was his duty, as the father and natural guardian of his child, to hold them for her use and benefit, and mere offers to sell, privately made, or acts of control, such as directing and controlling said negro, should not be considered at all inconsistent with the right of Leonora, or with the fact that she held the negroes in her possession.

"9th Issue. In determining upon the 9th issue, you will look to the evidence in the case, and will wholly disregard the recital in the bill of sale that plaintiff had paid for the negro, or the amount paid. It is merely the declaration of W. J. Hill, and is not evidence of the payment or the amount.

"10th Issue. If you are satisfied from the evidence that the plaintiff, at any time before he paid for said boy Burrill (if he paid at all,) was informed or had notice that Leonora claimed the negro, you will find the issue in the affirmative; and, further, it is not necessary that the plaintiff should have been told, or have been directly informed of the claim of Leonora. Yet, if her claim to the boy was so general and notorious in the neighborhood where W. J. Hill resided, as to raise an inference that he was informed of the claim, then you should find that he had notice as fully as if she had told him of her claim. The point appears to be this: Would a man of ordinary care and inquiry have learned of her claim from the repute in the neighborhood of the same? If so, the plaintiff should be held as affected with notice.

"12th Issue. Upon the 12th issue you are charged, in order to make the limitation of two years of any avail, you must be satisfied that W. J. Hill, for at least two years before the —— day of January, 1857, held, in his own right and as his own property,

the boy adversely to Leonora's claim, and thus held him continuously for two years before the — day of January, 1857; if you thus believe, you should find in your answer to the 12th issue that her claims were barred by limitation; that is, her claims were barred by two years' limitation before the boy went into her possession after leaving the plaintiff. But, on the other hand, if you find that W. J. Hill had held the boy as the father or natural guardian of Leonora, and as her property, and that he acknowledged her rights to the boy up to within two years of the time the boy left the plaintiff and went to the defendants, then you should find that the claim of Leonora was not barred by limitation. It should appear that W. J. Hill disclaimed all right of Leonora for at least as much as two years as aforesaid, and did not, during that time recognize or acknowledge her right to the boy. An occasional denial of her right and offers to sell, and, also, occasionally recognizing her right and acknowledging the same, are not sufficient to make out the ground of limitation. So you will see that it must appear in proof that W. J. Hill denied her right, and at no time within two years before the boy left plaintiff, acknowledged or recognized her right, but claimed the negro openly and publicly as his own for that period, before you should find that her claim was barred by limitation.

"13th Issue. In answer to the 13th issue, you are charged that if it appears that the letter was written before the plaintiff purchased the boy, that the boy is referred to in the letter, and that the plaintiff knew of the letter, and was influenced by its terms in the making of the purchase, then you should find this issue in the affirmative. But if it was not then written, or was not made known to the plaintiff, or if he was not induced by it to make the purchase, then you should find this issue in the negative; that is, that he was not influenced by the letter over the signature of Leonora to make the purchase."

A number of instructions were asked by both parties, but were refused by the court.

In response to the issues, the jury found, in substance, that the bill of sale from Hill to Carradine, and the deed of gift from the latter to the defendant Leonora, were made to defraud Hill's

creditors ; that Hill had possession of the negro Burrill up to the sale to Castleman; that the bill of sale from Hill to Carradine had never been recorded, but that the deed of gift from Carradine to the defendant had been recorded in Harris county, though not in Fayette; that from " admissions and evidence," the jury presumed that Castleman had paid $1000 for the boy; that before payment, he had no notice of Leonora's claim to the boy ; that the jury " decided that the defendants had no claim" to the negro ; and that the value of the boy was $1400, and his hires worth $200 per year, and had accrued for two years ten months and ten days.

On this special verdict, the court rendered judgment for the plaintiff for the negro, or for $1400, as his value, and for his hires.

The defendants moved for a new trial, assigning many causes in support of the motion, but the motion was overruled, and they appealed.

*W. G. Webb*, for the appellants.

*Tate & Shropshire*, for the appellee.

MOORE, J.—It would be an unprofitable task to attempt a discussion of the numerous questions which have been raised by counsel during the progress of this case, by exceptions to the ruling of the court in admitting and excluding evidence, in submitting and withholding special issues, in giving and refusing instructions, in overruling motion for new trial, &c. This motion alone presents forty distinct assignments in its support, some of which include a number of sub-divisions. And all of these points are embodied, and to some extent enlarged by the assignment of errors. To canvass a comparatively small part of the grounds that are, therefore, within the assignment of errors, would evidently prove an unprofitable consumption of time, and tend to the confusion rather than the elucidation of the law of the case. Without, therefore, adverting to the manner or order in which the questions are presented by counsel for the appellants, we will dis-

pose of it by a presentation of our views of the law applicable to the facts exhibited by the record, and by which its determination should be controlled.

Leonora Lewis, one of the appellants in this court, and a defendant in the District Court, claims the negro now in controversy, under a conveyance for a number of negroes, executed in the county of Harris, in the early part of the year 1840, by her father, Warren J. Hill, to her cousin, George R. Carradine. This deed was never recorded, but at and previous to the date of its execution, Carradine was in the possession of the property embraced in it, under a contract of hiring between himself and Hill. On the 28th of March, 1840, Carradine, at the instance of Hill, executed deeds of gift for the negroes conveyed to him, as aforesaid, to Hill's children. One of these deeds of gift was made to Leonora Lewis, then Leonora Hill, a child about twelve years old, residing with her father. This deed was delivered, together with the negroes embraced in it, by Carradine to Hill, as he states in his deposition, for Leonora. And the deed was in a short time thereafter duly recorded in said Harris county. Shortly afterwards, and in the year 1840, Hill removed to Fayette county, bringing with him the negroes embraced in said deed, one of whom was the ancestress of the negro here in controversy, who was born in 1841 or 1842, and has continued in Hill's possession from that time until shortly before the commencement of the present suit, when he was purchased by Castleman, the appellee here and plaintiff below. But whether he was at that time in Hill's possession is not clearly shown. It is shown, however, that after his purchase, Castleman had possession of the negro for a part of a day, while one of the witnesses for appellants states positively that the negro was in their possession on the day that Castleman alleges he purchased. Mrs. Lewis continued to reside with her father from the date of the deed of gift from Carradine until her marriage, the date of which is not definitely fixed, but it could only have been a short time before the commencement of this suit. The conveyance, under which Mrs. Lewis claims, was never recorded in Fayette county, but there is much testimony tending to show the notoriety of her title in the community where the parties lived, and that it

must have been known to Castleman, who for a number of years had resided from four to eight miles from Hill. It was shown, however, that Hill managed and controlled the property as if it were his own, and enjoyed the use and benefit of it, though he often and repeatedly disclaimed owning any negroes, and admitted his daughter's title. Yet it is also shown, that sometimes when he wished to purchase property he would claim that the negroes in his possession belonged to him. Mrs. Lewis was, at the date of her marriage, some twenty-eight or thirty years of age, and the appellee contends that if she ever acquired title by the deeds from Hill and Carradine, she had lost it by limitation ; also, that she was estopped by a letter written by her to Mrs. Eliza S. Hill from disputing her father's title. The deed to Carradine, and that from him to Mrs. Lewis were conclusively shown by the testimony of Carradine to have been a fraudulent contrivance on the part of Hill to defraud his creditors.

The appellee maintains that Mrs. Lewis' title is made void as against purchasers from Hill, by the statute of frauds. His counsel insists that each of the three clauses of the second section of the statute applies to it and precludes her from denying his right of recovery. We will consider the application of these different clauses of this section of the statute of frauds in the reverse order from that in which they are found in the statute. The last clause declares void, loans, limitations, reservations and remainders of personal property as to purchasers from the party in possession for three years, without demand made and pursued by due process of law, unless proved by instruments in writing duly recorded, &c. Carradine says in his deposition : " It never was his (Hill's) design, I think, to divest himself of the negroes during his life-time. He intended securing them through his children from his creditors, but to have the enjoyment of their services while he lived, and at his death for them to be vested in his children." As we understand counsel, they intend upon this branch of the case, to insist that this evidence shows that Hill was entitled to the immediate possession of the property as a life estate, loan or use, with a remainder to Leonora, and the title of record to her not showing this, the reservation or remainder in her favor is cut off

by this clause of the statute. Without at present pausing to inquire whether parol testimony is admissible for the purpose of thus varying and contradicting the legal effect of written instruments, or if admissible for this purpose, whether the mere impressions of a witness, as in this instance, can be received and permitted to have this effect, we have no hesitation in saying that the conveyances in question, taken in connection with Carradine's testimony, present a case clearly within the first clause of this section of the statute of frauds, and within the third. Conveyances in fraud of creditors or purchasers are, as to the parties intended to be defrauded, pronounced void by the first clause, but as between the parties themselves they are valid. The law makes the conveyance void in favor of those who should be protected against it, but it does not permit the vendor at his own option, to avoid the effect of his fraudulent act. That a vendor intends by his conveyance to secure the use and enjoyment of his property, is the usual incident of such transactions. That this was the object and purpose of its execution, places him in no better position than if it were for any other cause held fraudulent, which would evidently be the case, if the third instead of the first clause of the statute is held applicable to the transaction. Of course we do not mean to be understood as intimating that the title of the fraudulent vendee may not as readily as that of any other owner, be lost by this third clause, if he permits the title and the possession to become separated as therein prohibited. We simply say that the secret intention of a father in executing a conveyance, in fraud of his creditors, to a minor daughter residing with him, to retain the use and enjoyment of the property, does not present such a case. If, since Mrs. Lewis arrived at an age to affect by her acts her title to the property, she has in contemplation of law parted with the possession for the time indicated in the law, it must be held applicable to her. The law applicable to the question of possession will be adverted to in connection with another branch of the case, and we therefore at present pass it by.

It is also said Mrs. Lewis' title is fraudulent within the second clause of the statute. This clause, like the one we have just been considering, applies as well to *bona fide*, as intentionally fraudu-

27*

lent conveyances. No matter what may be the object or purpose of their execution, if not upon consideration deemed valuable in law, unless evidenced by writing proved and recorded, or the possession really and *bona fide* remain with the title, such conveyances will not be upheld or sustained. But if the donee remain in possession, or the instrument is duly recorded, it will be enforced, if in other respects valid, without questioning the purpose of its execution. It would seem to follow that when, tested by the character and purpose of the conveyance, the situation and nature of the property and parties, the possession as between the grantor and grantee has passed and become vested in the grantee, the instrument must be regarded as complete and perfect. Aside, then, from the fact that the law holds fraudulent conveyances effectual and valid between parties and privies, Carradine being in possession of the negroes when he accepted the deed from Hill, it can not be said that it is inoperative for the omission to record it, or the failure to deliver the property to him. The deed from Carradine to Mrs. Lewis was not only recorded, but was also accompanied by a proper delivery of possession of the property, and certainly as between the donor and donee in this last instrument, was fully sufficient to divest him of title. It has never been questioned that the delivery to the father for his minor child residing with him, is sufficient to support a parol gift from a stranger. And in Alabama, in a case between a son, who resided with the father at and subsequent to the alleged gift, and a subsequent purchaser from the father for full consideration without notice, the court says: "But assuming the delivery to have been made to the plaintiff, or some one else for him, we are of the opinion that the possession of the donor, *under the circumstances*, could not invalidate the gift." (Sewell v. Glidden, 2 Ala., 60.) And in Kentucky, it is said, "that where a gift is made to an infant, and the father takes possession, he holds as the natural guardian of the child, and the possession must be considered the possession of the child; and consequently the property is not liable to the father's debts." (Blair v. Dade, 9 B. Mon., 63.) It may be insisted, however, that as the conveyance to Carradine was fraudulent, it can not be said, that his possession was such as is required by

the statute. We do not understand the statute, in requiring that possession must really and *bona fide* remain with the donee, to have any reference to the good or bad faith of the title with which it must really and *bona fide* remain. If the conveyance is fraudulent, the proper parties are protected against it by the first clause of the same section of the law. But this clause was intended to protect the owners of property, as well as persons claiming under them, against pretended and imperfect gifts and conveyances not on valuable consideration, by declaring fraudulent all such as are not evidenced either by an instrument in writing, properly recorded, or by the actual delivery and continuance of possession. The record of the instrument is tantamount to the retention of possession; the retention of possession is tantamount to the record. The force and effect of neither is impaired or controlled by the purpose of the instrument in testing its sufficiency in this particular. That the party must *bona fide* remain in possession, was to guard against pretended deliveries. If it were conceded that the conveyances from Hill to Carradine, and from the latter to Mrs. Lewis, were executed at the same time, and are to be viewed as part and parcel of the same transaction, it must be admitted under the authority of the cases from Alabama and Kentucky, to which we have referred, that the delivery of the property and subsequent retention of possession by Hill, vests the property and possession in Mrs. Lewis, unless the fraudulent purpose of the conveyances will change the principle otherwise applicable to the case. Were it true, however, that the court will look beyond the legal purport of the conveyances as expressed in the deed, and seeing that they are for a fraudulent purpose, will say that the rule which would otherwise apply, is not applicable here, it surely would not hear such a suggestion from the fraudulent vendor. To do so, would be to permit him to avoid his deed by proof of his own fraudulent intent. Neither could his vendees, with notice, occupy a better position, for in this State it is settled that they acquire no title. (Fowler v. Stoneum, 11 Tex., 478; Robinson v. Martel, 11 Tex., 149.) And if it is insisted that appellee is a purchaser without notice, and therefore the presumption should be indulged in his

favor, that the possession was not *bona fide*, we answer, if such is his status, the contest as to the applicability of this clause of the statute to his case, is a barren one, for he is fully protected by the preceding clause, and to bring this one to his aid would wrest it from the purpose for which it was enacted, and tend to unnecessary confusion in its construction.

We conclude, therefore, that the first clause of the second section of the statute of frauds is the only part of this law applicable to this case. The testimony in the record leaves no room for doubt, that the conveyances by which Mrs. Lewis claims her title were made and intended, by the grantors, for the purpose of delaying and defrauding Hill's creditors; and that they are, therefore, void as to subsequent purchasers from him without actual or constructive notice of Mrs. Lewis' title. The deed to her was not recorded in Fayette county, and it can not therefore be said that Castleman was chargeable with record notice. And although, as we have said, the delivery of the negroes, together with the deed of gift by Carradine to Hill, vested the possession in accordance with the title, in legal contemplation, in Mrs. Lewis; yet, as the negroes were in the control and used by Hill in apparent right of ownership, third parties were not chargeable, by reason of the possession which she thus acquired through her father, with notice of her title. Was it, then, brought home to Castleman, by proof of actual knowledge on his part, or by the proof of such facts as must induce the belief that any ordinary prudent man, with his opportunities of information, must have known, before making the purchase of the negro, of her title? From the testimony, it is difficult to realize that Castleman was not fully informed, at the time he purchased the negro, of the situation of the title and the nature of Hill's possession. The facts seem to have been matter of general notoriety in the community. Hill is a man who, evidently, often resorts to shifts to raise money. From Castleman's statement he had previously loaned him money, and had taken a lien upon other property to secure it. Dealing with such a man, it is hardly probable that he failed to enquire and inform himself as to the nature of his security, and the character of the title of his vendor. On the day after his purchase, he wished to demand

the negro of Mrs Lewis, after her husband had refused to deliver him.  He must have then known of her claim.  When the negro ran away from him, he knew immediately where he had gone. And if he saw the letter to Mrs. Eliza S. Hill previous to his purchase, which, however, is hardly probable, this, of itself, informed him that the title of the negro, if one of those referred to in the letter, was not in Hill; for, it is evident, if the negroes were so situated that they could not be taken from him, it must have been for the reason that the title was not in him.  It was necessary, however, for Castleman to have shown that he was a purchaser for value: but we find no testimony in the record to sustain the verdict of the jury in this particular; and if it can be upheld on the question of notice, a new trial should, for this reason, have been granted.  Before leaving this branch of the case, we will say that the instructions given to the jury, upon the subject of notice, and in respect to the payment of the consideration for the purchase, is believed to be correct.  It presents the law applicable to the questions in a clear and perspicuous manner.

Under the facts presented in the record, it is not perceived that the statute of limitations could have any application to the case. The possession of the father was in a fiduciary character for his daughter.  There must have been proof of distinct and unequivocal repudiation of her title, brought home to her, before the statute of limitation would commence to run.  We see nothing in the record tending to show that such was the fact.  Certainly there is no ground to infer an adversary possession of the negroes while his daughter was a member of his family, which she continued to be until her marriage.  This, from the testimony, could not have been as much as two years before the bringing of the suit; and it is not ascertained by the verdict, in whose possession the negro was subsequent to January 26th, 1854, three years before the commencement of the suit.

The letter signed "Leonora," upon which Castleman relies as an estoppel of Mrs. Lewis' right to claim the negro, is wholly insufficient for this purpose.  An estoppel, it is said, must be mutual: there is and can be nothing of this sort here, or between these parties.  The act constituting an estoppel *in pais* must have

been acted upon—there was not the slightest evidence to show that such was the fact; on the contrary, the presumption arising from the contents of the letter, in connection with some of the testimony, is, that it was not written until after the commencement of the present suit. Nor will the contents of this letter, if it is admitted that it has reference to the negroes conveyed to Mrs. Lewis by the deed from Carradine, and had been seen by Castleman before his purchase, authorize the conclusion that she was thereby estopped from asserting her title, or had relinquished her claim to the negroes. What does the whole letter import when scanned most stringently against Mrs. Lewis? Simply that she had the legal right to the negroes referred to, though the moral right to them was in her father, and that she did not intend to assert her legal title to them against him. The asseverations that she will not rob him; that as the property stands, no one can take the negroes from him, and that she will not, clearly imply that she could do so if she were willing to violate her sense of moral propriety, and filial duty. If she has reference to these negroes, the evident meaning of the letter is, that she knows the secret and fraudulent purpose for the accomplishment of which the negroes were conveyed to her, and that she recognizes it as morally binding upon her; but this imports no legal obligation that can be enforced by her father, or any one purchasing from him with knowledge of the facts. Nor is it a fair inference from the letter, that she contemplated a surrender of the title which she holds to the property. It seems rather that she intends to hold it, to enable him to enjoy the use of it; and in her view, as an affectionate daughter, it may have been as necessary to preserve the property against future debts or sales, as against pre-existing liabilities. At least, a purchaser, if informed, as he must have been if he saw the letter, that the legal title of the negro was in her, can claim to stand in no better attitude than his vendor. Nor can the letter be relied upon as a relinquishment of her title, for want of a consideration to support it as such, if in other respects it was unobjectionable.

The judgment is reversed and the cause remanded.

Reversed and remanded.