BINDER v. MILLIKIN. (No. 5958.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 23, 1918. On Motion for Rehearing, March 6, 1918.)

1. APPEAL AND ERROR ⬥879—PARTIES ENTITLED TO ALLEGE ERROR.

Where no objection was made by intervener or any one else to the judgment in his favor and he is not included in the appeal bond and made no motion for new trial, he has no standing in the Court of Civil Appeals.

2. PRINCIPAL AND AGENT ⬥92(1)—PERSONS DEALING WITH AGENT—GOOD FAITH.

Persons dealing with an agent must act in good faith, and not seek an unconscionable advantage over his principal.

3. PRINCIPAL AND AGENT ⬥45 — REVOCATION OF AUTHORITY.

When the agent turns aside from his plain duty and seeks individual advantage inconsistent with the rights of his principal, his authority is automatically destroyed and the agency revoked.

4. PRINCIPAL AND AGENT ⬥148(2)—MISREPRESENTATIONS—ESTOPPEL.

Where the purchaser secretly agreed with vendor's agent that the agent should become a partner in the purchase and that a contract should be signed by which the security of the vendor would be greatly impaired, a fraud was perpetrated upon the vendor estopping the purchaser from asserting any claim for misrepresentations of the agent made prior to such partnership agreement.

5. VENDOR AND PURCHASER ⬥36(1) — MISREPRESENTATION—OPINION.

An assertion that land was the best in the county, and was a bargain at a certain price, and could be sold, was a mere opinion.

6. LIMITATION OF ACTIONS ⬥100(1) — DEFENSE OF FRAUD—ACCRUAL OF RIGHT.

The statute of limitations will not run against defense of fraud until the fraud is discovered, or by the use of reasonable diligence might have been discovered.

7. VENDOR AND PURCHASER ⬥43(2)—MISREPRESENTATIONS—WAIVER.

Where the purchaser knew the land before he bought it, was in possession, and could have known of the falsity of all the representations of the vendor's agent, and did know of the falsity of the same but made no claim for damages or evinced any desire to rescind for more than five years, he waived any claim arising from the misrepresentations.

8. SET-OFF AND COUNTERCLAIM ⬥35(1)—UNLIQUIDATED DEMANDS.

Under Rev. St. art. 1325, providing that any counterclaim may be pleaded against the claim of the plaintiff, and article 1329, providing that if the suit be founded on a certain demand defendant shall not be permitted to set off unliquidated or uncertain damages founded on a tort or breach of covenant, in a suit on notes evidencing the balance due on the purchase price of land, the vendee could not plead in offset or for compensation unliquidated damages for misrepresentations of agent who sold land.

On Motion for Rehearing.

9. APPEAL AND ERROR ⬥171(1)—CHANGING THEORY OF CASE.

Where defendant pleaded and proved the theory upon which he sought to recover, he will not be permitted to recover on a theory made by the evidence of an intervener who conspired with him against the principal.

Appeal from District Court, La Salle County; J. F. Mullally, Judge.

Suit by H. W. Binder against W. H. Millikin, in which J. R. Black intervened. From the judgment rendered, plaintiff appeals, and intervener files a brief. Reversed and rendered.

Hicks, Hicks, Dickson & Bobbitt and B. W. Teagarden, all of San Antonio, E. C. Tinley, of Council Bluffs, Iowa, and Guinn & McNeill, of San Antonio, for appellant. Mann & Henry, of Laredo, J. Albert Strawn,

of Cotulla, and Arnold, Cozby & Peyton, of San Antonio, for appellee.

FLY, C. J. This suit was instituted by appellant against appellee to recover on two promissory notes executed by appellee, each in the sum of $83,333.34, payable respectively on September 1, 1913, and September 1, 1914, each bearing date of May 13, 1911, the consideration therefor being part of the purchase money of about 21,845 acres of land in La Salle county, Tex. It was alleged that appellee had paid $123,333.34 on the land and that the two notes sued on evidenced the balance due on the purchase money of the land. The original answer of appellee consisted of a general demurrer and general denial. That answer was filed on October 24, 1916, and on February 7, 1917, an amended answer was filed which, among other things, set up fraud on the part of the agent of appellant and his undisclosed cestui que trust or beneficiaries in the land, whereby he was overreached and caused to pay largely more for the land than it was worth. Appellee prayed for a rescission of the contract of sale, and in the alternative for damages in the sum of $200,000. J. R. Black, the agent who was alleged to have made the fraudulent representations in regard to the land, intervened in the suit. The cause was tried by jury and resulted in a verdict and judgment that appellee had not acquired the interest of J. R. Black in the land; that appellee should recover of appellant $125,756.62, the difference between $300,000 paid by appellee for the land and personal property, and its market value with legal interest from April 25, 1915; and that appellant recover of appellee the balance remaining of $67,667.02. A lien was foreclosed on the land to secure the amount last named.

[1] No objection was made by Black or any one else as to the judgment in his favor, no motion for a new trial being filed by him. He is not included in the appeal bond but files a brief here, styling himself appellant. He got all he asked for in the trial court, seems to have been perfectly satisfied with the verdict and judgment, and all the other parties are satisfied also, and he has no standing in this court. If he desired to assist appellant in his case, and had any interest therein, he should have had himself made a party plaintiff, and should have preserved his rights, if any, by proper action in the trial court.

The facts show that appellant, representing a number of nonresidents of Texas, bought about 22,000 acres of land in La Salle county; the trustee having an interest in the land with the other beneficiaries. The land was bought by a number of men, the title being placed in a trustee because of the large number of the beneficiaries. On May 13, 1911, the land was sold by the trustee to appellee. The sale was brought about through negotiations between J. R. Black, one of the beneficiaries who had charge of the land, and appellee; and a preliminary contract of sale was entered into between Black and appellee, the understanding being that appellee would go to the home of appellant in Council Bluffs, Iowa, and there enter into a final contract for the purchase of the land. The contract made by Black was not approved by appellant on account of certain provisions as to releasing certain portions of the land from the vendor's lein, upon payment of certain sums. Appellee had been shown over a large part of the land before signing the first contract, but, after that was rejected by appellant, appellee again visited the land and went over and examined it. He then in company with Black went to the home of appellant in Iowa, and there the final contract of purchase was entered into between appellant and appellee; the latter agreeing to pay for the land, live stock, and other personal property, the sum of $300,000, the sum of $10,000 in cash, four notes for $10,000 payable in June, July, August, and September of 1911, and three notes each for $83,333.34, payable respectively on or before September 1st of 1912, 1913, and 1914. The cash payment was made, and all the notes were paid except the last two for $83,333.34 each, which were not paid and form the basis of this suit. After the execution of the contract of purchase, appellee and Black went into possession; this being about May, 1911. There was an agreement between appellee and Black that the latter should have a one-half interest in the property bought from appellant. Appellee testified that on April 27, 1911, which was just two days after the "preliminary contract," as appellee calls it, appellee was in Tulsa, Okl., where he received a telegram from Black asking him to write him (Black) a letter stating that he had bought everything and would sell Black a half interest in the property at the same price and on the same terms as appellee paid. A month thereafter appellee wrote and sent a letter containing an option to Black to buy one-half the land, and he and Black formed a partnership which continued for about two years, when it was terminated by a personal difficulty between the partners, and Black then left the property. Appellee visited the land a number of times and went all over it before and after he purchased it, but no complaint was made about it until four months after this suit was instituted, when the second amended answer was filed.

Appellee swore that the representations of Black were that the land contained 21,874 acres of land, more or less; that it was the best land in La Salle county; that 8,000 acres of it was river bottom, and it could be cheaply irrigated from the river; that the balance of the land was worth from $15 to $25 an acre, and the land was a bargain at $300,000; that it was worth $500,000 or more; that the land could be sold; that there was a demand for such lands; and that the land was good for agricultural and irrigation pur-

poses. He also represented that the land would produce two crops a year and the crops would be worth $250 an acre; that the owner had made large money in farming the land; that other parties were anxious to purchase the land; that they had sold 90 per cent. of the land from the Cross S ranch; that they had nine automobiles and an agency in five states; that the river had from 6 to 8 rises every year; that the well on the land produced water good for irrigation; and that it would furnish from 500 to 600 gallons a minute. He also told appellee that it would be wise to buy Binder's half interest in a certain 400 acres and locate a dam on it.

These representations, appellee swore were made on his first visit to the land, but were not acted upon there, and appellee and Black returned to San Antonio, where he states the following matters occurred:

"With reference to what occurred after we came back to San Antonio from that trip with reference to me taking the whole ranch or part of the ranch between Black and I, I would say after making all these representations he got me interested, and I was willing to buy $50,000 worth of the land. Then he told me that his company would not sell a part of it, but that they wanted to sell it all. Then I suggested that I might get interested in the company—in the parent company—and we talked about the party who lives in Philadelphia. He told me he was connected with the Penn Life Insurance Company. That name has slipped my memory, but he told me he either owned or controlled $30,000 worth of the interest in the concern, and he wired that company or that gentleman inquiring what he would take for his stock, and I do not remember what the reply was; but I was not given an opportunity to buy that at least. Then I told Mr. Black that the proposition was entirely too large for me to take on and I did not care to enter in the purchase of the whole property. Then, possibly five or six hours after this, he came to me again and said to me if I would purchase the property he would take one-half interest in it. He told me of his ability to take care of that half interest, and that he had two or three farms in Iowa, and under that promise I did buy the whole property. I then signed the preliminary contract very soon after that. I would not be positive as to whether it was that day, or the next day, I signed it and put up a check of $1,000, is my recollection, I think it was that day or very soon after. This contract that you show to me, dated the 25th of April, 1911, is the one that I refer to."

The first contract was not made, it appears, until after Black had entered into a partnership with appellee to buy the land, and the contract was really one of sale to Black and appellee, made by Black and appellee. Before the contract of sale was made, the agent had turned aside from his agency and was acting in behalf of his own interest. In that contract, which was repudiated by his principal, Black endeavored to bind his principal to release to appellee any of the land sold by him, upon a payment by him of $15 an acre, which placed it in his power to have the best land released for that price and leave the less valuable land as security for deferred payments. It was an agreement clearly adverse to appellant and

in the interest of Black and appellee. Black had turned aside from the faithful and loyal prosecution of the work of the agency; he had assumed to enter into a partnership with a prospective buyer of the subject of the agency and to contract for privileges for the partnership inimical to the interests of the principal. This act of his destroyed the agency, and when he made the preliminary agreement he acted only in his interest and that of his partner. That contract was so one-sided and unfavorable to his principal that it was promptly repudiated. Appellant, not understanding the relation between the parties, could not understand the inducement for such an agreement. He immediately wrote Black:

"I am surprised that you would sign any agreement agreeing to release any of our land on the payment of $15 per acre. Do you realize what this would mean; and that you agree to accept $6,000 and release acres of cleared land; together with our improvements? This is exactly what your agreement says. And again, would you agree to release 5,000 acres of river land for $75,000, and then we hold the 17,000 acres of prairie land for the balance of the $225,000? You know well enough that 17,000 acres of prairie land are not worth $225,000, and it would be extremely foolish for us to agree to release the best part of our lands on the same ratio as the prairie land, with the probability of the party laying down and our keeping the prairie land at the rate of $15 an acre. Personally I cannot imagine what you were thinking of."

His imagination would not have been severely taxed if he had known that his agent was a purchaser of part of the land. Appellant knew nothing about this fact until December, 1912, over a year after the sale was made. In pursuance of the verbal agreement of partnership in the land made before the first contract was executed, the agreement was reduced to writing and signed by Black and appellee on May 27, 1911, about a month after the preliminary contract had been signed by the parties, and about two weeks after the final contract was made with appellant.

[2] Appellee knew that Black was merely an agent to procure a purchaser, he knew that he could not make a binding contract without consulting his principal, and he knew that he and Black were endeavoring to lead the principal into an agreement that was detrimental to his rights and injurious to his interests. It is a salutary and well-established rule that persons dealing with an agent must act in good faith, and not seek an unconscionable advantage over his principal. The rule is thus stated by Mechem, in his work on Agency (section 751):

"Collusion with the agent to take advantage of the apparent at the expense of the real authority, the willful shutting of eyes to restrictions which would otherwise be obvious, or any other practice to pervert the rules of law to a purpose not contemplated by them, should be fatal to a recovery."

[3] The law abhors double dealing, especially upon the part of one in whom a trust

is reposed and confidence given; and when the agent turns aside from the plain paths of his agency and seeks individual advantage inconsistent with, and antagonistic to, the rights and interests of his principal, his authority is automatically destroyed and agency revoked. He cannot be permitted to hold a position where self-interest and honor become contending forces, and where dire temptations would assail and ordinarily conquer him. Quoting the same author (section 754):

"It is fundamental that an agent, without the full knowledge and consent of his principal, will not be permitted to act as agent in transactions in which he is personally interested. It is often said that his endeavor to do so operates as an immediate revocation of his authority. That an agent undertakes to do so is therefore enough to put the other party on his guard."

As said in Pine Mt. Coal Co. v. Bailey, 94 Fed. 258, 36 C. C. A. 229:

"As long as the agent is conducting negotiations for his principal with third parties, he may act on his behalf; but the moment he undertakes, without the knowledge of his principal, to conduct them with himself, his agency ceases, and the powers and liabilities of that relation no longer exist."

The law is so jealous of the good faith and loyalty of agents that it will not permit the agent to blend his private interests with those of his principal, and no such authority will be allowed unless granted in express terms by the principal. This principle is clearly stated by the New York Court of Appeals in the case of Bank of New York v. American Dock & Trust Co., 143 N. Y. 559, 38 N. E. 713, in which it was held an agent authorized to receive goods for storage and issue warehouse receipts therefor did not have authority to issue receipts to himself. The court said:

"It is an acknowledged principle of the law of agency that a general power or authority given to the agent to do an act in behalf of the principal does not extend to a case where it appears that the agent himself is the person interested on the other side. If such a power is intended to be given, it must be expressed in language so plain that no other interpretation can rationally be given it; for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time."

The principle is reasonable, and there is no escape from it.

The courts of Texas have followed the rule stated, and in the case of Cotton v. Rand, 93 Tex. 7, 51 S. W. 838, 53 S. W. 343, the Supreme Court says:

"We are clearly of the opinion that such a breach of duty on part of an agent, unless condoned by the principal with a full knowledge of the facts, puts an end, ipso facto, to the agency. The law requires fidelity of agents and holds them no longer capable of representing their principals when, without the knowledge of the latter, they acquire an interest in the matter of the agency adverse to that of their employers."

[4] When appellee secretly agreed with Black that the latter was to become his partner in the purchase of the land and that a contract should be signed by which the security of appellant would be greatly impaired, a fraud was being perpetrated upon appellant, which would destroy any rights that appellee might have against appellant arising from misrepresentations made by Black to him. His collusion with Black worked an estoppel against any claim he might have against appellant. Appellee did not at any time make known to appellant that he and Black were partners in the purchase of the land, but concealed it, and Black did not mention it until many months after the sale was consummated. Appellee was charged with knowledge that an agent must not become a partner or otherwise jointly interested in purchasing the property. That rule is firmly fixed. Texas Brokerage Co. v. Barkley, 60 Tex. Civ. App. 466, 128 S. W. 431; Fisher v. Seymour, 23 Colo. 542, 49 Pac. 30; Whitley v. James, 121 Ga. 521, 49 S. E. 600; Pierce v. Beers, 190 Mass. 199, 76 N. E. 603; Finch v. Conrade, 154 Pa. 326, 26 Atl. 368. The burden rested upon appellee to show that appellant was cognizant of the partnership between appellee and Black before he executed the contract of sale.

Appellee having entered into a secret partnership with the agent after the representations had been made upon which the claim for damages is based, having made such secret arrangement with the knowledge that the law did not countenance such agreement, forfeited all right to damages based upon such prior representations. Cooper v. Ford, 29 Tex. Civ. App. 253, 69 S. W. 487.

The facts show that appellee, knowing that Black was the agent of nonresidents, made a secret contract of partnership with him, whereby the agent contracted for secret sale of land to the partnership and concealed the fact of the partnership from appellant, and only years afterward, when sued for the balance of the purchase money, after he and his partner had dissolved on account of some social scandal, the representations were sprung in a plea for rescission and in reconvention on account of the fraud of the partner, and he is in no position now to gain anything arising from the representations of that partner.

[5] Hereinbefore we have stated the representations made by Black to appellee upon which he relies for damages, and we think that an analysis of them will show that appellee knew of the falsity of the representations, or could have known by the least diligence, at least four years before the representations were pleaded as the basis of damages. The land did contain about 22,000 acres of land, and there was no falsity in that representation. Appellee admitted that the land was "all right," the only trouble arising as to the water, so there was no trouble as to the quality of the land. However, the assertion that it was the best land in La Salle county and was a bargain at $300,000 and could be sold was a mere opin-

ion, and appellee knew that fully. There was no evidence that showed that the land was not good for agricultural purposes, nor that it would not produce two crops a year and the crops worth $250 an acre, or that the owner had not made money cultivating the land, or that other parties were not anxious to purchase the land. What difference could it have made if Black and his principal were not the expert land sellers he said they were, or whether they owned nine or ninety automobiles and had agencies in five states? Those representations could not have influenced any sane, well-balanced man, and it was not shown that they were untrue. Appellee thoroughly investigated the land, he knew or could have known the kind of water in the well, and why it would be any inducement to the river to rise six or eight times a year does not appear. Texas farmers usually fear rises in the rivers even once a year. Appellee could have easily tested the flowing capacity of the well by a few minutes' test. The opinion of Black as to the purchase of a certain 400 acres of land for a site for a dam could not have influenced a purchase except as to that particular tract. Appellee must have known of the truth or falsity of any and all of the representations two or three years, or more, before he alleged them in his answer. Even after he was sued, the representations of Black did not occur to him until the expiration of four months, although he had filed an answer in the cause less than three weeks after the suit was filed.

Appellee was called upon to exercise some diligence to discover the fraud, especially when the least diligence would have disclosed the falsity of any and all of the representations in a short while after they were made. If the river did not overflow six or eight times a year, that fact could have been ascertained in one year; if the land was not irrigable, that should have been known in a few months. And this is true in regard to every alleged representation made by Black to appellee. Appellee has offered no sufficient reason for his failure to discover the fraud. In 1911, when he and Black sought to build a dam, it was stated in the contract: "At ordinary stages the river has very small flow and frequently none, but is subject to occasional rises." Appellee had one of the rises in the river, which he claims were inducements to his purchase; but the result was great injury to his dam. No expert was requested to estimate the number of acres that could be irrigated until preparation for the trial of this cause was being made. The expert advised appellee to have the estimate made shortly after appellee bought the land, but he refused to have it done. His partner had an analysis made of the water in the well in 1911, but appellee claims he did not see it. He knew the water was not palatable. Gordon v. Rhodes, 117 S. W. 1027.

[6] The rule in regard to suits or defenses based upon fraud is that fraud will only prevent the running of statutes of limitation until the fraud is discovered or by the use of reasonable diligence might have been discovered. Bremond v. McLean, 45 Tex. 19; Kuhlman v. Baker, 50 Tex. 636; Kennedy v. Baker, 59 Tex. 160; Cooper v. Lee, 75 Tex. 114, 12 S. W. 483. The rule is well established; but it is the contention of appellee that it does not apply to a case of this character, where the defendant seeks a recovery of damages arising from fraud as an offset to the claim of appellant. In other words, the contention is that the claim for damages based on fraud used in obtaining the contract as a defense will not be barred by any lapse of time, but that the defense will be available when a suit is filed on the contract. To sustain this proposition, the following Texas cases are cited: Moore v. Hazelwood, 67 Tex. 624, 4 S. W. 215; Rutherford v. Carr, 99 Tex. 101, 87 S. W. 815; Gilmore v. O'Neil, 107 Tex. 18, 173 S. W. 207; Rosborough v. Picton, 12 Tex. Civ. App. 113, 34 S. W. 791, 43 S. W. 1033; Snow v. Gallup, 57 Tex. Civ. App. 572, 123 S. W. 227; Ft. Smith v. Fairbanks, 101 Tex. 24, 102 S. W. 908.

In no Texas case, coming to our notice, has it been held that a cross-action against a plaintiff will not be barred by limitation. A review of the cited cases will show this. The case upon which most reliance seems to be placed is that of Rosborough v. Picton, decided by the Galveston Court of Civil Appeals, in which it was held:

"The statute of limitation, in our opinion, has no application to the case. It is not a suit to recover anything from the defendants, but is the assertion of a partial defense to the notes which were made the basis of the proceeding to sell under the trust deed, and which defense might become ineffectual if the sale were allowed to proceed. It has been held that a defense of this character can be made to a suit for the purchase money whenever it may be brought, and that the statute of limitations has no application."

That case was one for an injunction to restrain the sale of land under a trust deed on the ground that there was a deficiency of 1,200 acres in the land. The court held that the petition set up defensive matter. The court held that the cause of action never arose until there was a proceeding to sell. The court said:

"He neither has nor asserts a cause of action to recover money paid, because he has not paid anything in excess of what he owed, and such a cause as that only arises when the vendee has paid more than was due for the land which he actually got."

That decision does not hold that a cross-action based on fraud will not be barred as long as the contract upon which it is based is in force.

In the cited case of Moore v. Hazelwood, the facts showed mutual mistake as to the boundaries of surveys called for in the deed,

and the court held that the defense could be urged whenever an action for the purchase money was brought. It was a part of the contract on which the recovery was sought, and not a matter outside of it, which might form the basis for an action for damages.

In the case of Rutherford v. Carr, it was merely held:

"There is no statute of limitation which prescribes a bar to the proof of a fact material to sustain or defeat a cause of action or defense; such statutes act upon the cause of action."

That decision does not hold that a cross-action for damages for fraud can be set up in an action for purchase money regardless of limitations.

In the case of Snow v. Gallup, it was held that the defendant had not pleaded any cause of action, nor had he asked for any affirmative relief. His pleadings were defensive only. That does not fit this case.

In the case of Ft. Smith v. Fairbanks, the plaintiff instituted suit on a note given for a pump and attachments and the defendant filed a cross-action for damages resulting from the failure of the pump to perform its functions. The court held:

"It is true that limitation does not affect defenses which are properly applicable to a plaintiff's cause of action, but nothing of that nature is set up. The defendant kept the property, gave his note for the price on December 15, 1902, after all the transactions referred to had passed, has made payments upon and repeatedly promised to pay it, and has never denied his liability upon it. He does not plead a failure of consideration, entire or partial, but asserts a cause of action for damages for a breach of contract. This is not a defense, but a cross-action."

So it is in this case, where appellee sets up a cross-action as a plea in reconvention founded on fraud to defeat appellant's cause of action in whole or in part. The decisions cited do not sustain the contention of appellee.

On the other hand, in a case in which a defendant sought to defeat an action on a promissory note by a plea for damages arising out of fraud, the Supreme Court, in Ney v. Rothe, 61 Tex. 374, held:

"Upon the question of fraud the court instructed the jury that fraudulent concealment by the plaintiff would prevent the running of the statute against the defendant until the facts were discovered, or until, by the use of ordinary diligence, they might have been discovered by him."

That was approved by the court.

[7] In this case appellee knew the land before he bought it. He was in possession, and he could have known of the falsity of any or all of the representations made by Black. He did know of the falsity of some of them, and yet he made no claim for damages, nor evinced any desire to rescind the sale for more than five years. His acts amounted to a waiver of any claim arising from the representations. Kennedy v. Bender; 104 Tex. 149, 135 S. W. 524. Appellee made heavy payments on the land, he made improvements on it, he wrote a number of letters about it, and never at any time intimated that he had been cheated or defrauded, and the fact of the bad treatment did not seem to break in upon his mind until months after he had been sued for debts due by him. He must have had fully as much knowledge of the fraud three or four years before his action for rescission and in reconvention was filed, and, if so, his action would be barred. It is held that two years would bar such actions. Gordon v. Rhodes, 102 Tex. 300, 116 S. W. 40.

Appellee sought in the first place a rescission of the contract of sale and a recovery of all his payments on the land with interest, and, in the event he failed to get that relief, he sought a judgment against appellant for damages in the sum of $200,000 and the cancellation of the notes. In other words, if he could not rescind, he wanted the land at considerably less than one-half he agreed to pay for it. The court held that he could not rescind, but allowed appellee to make a new contract and take the land at his own valuation.

If appellee had sought to show any claim against the two notes, if he had sought to show a deficiency in the acreage, or if he had sought to prove that there was a failure of consideration in whole or in part, he might claim that it was merely a defense arising out of the facts of the case; but he pleaded in reconvention for damages. It was an action so independent of the suit on the notes that he could have instituted a separate suit and upon proper proof have recovered against appellant. It did not grow out of, and was not a part of, the notes on which the suit was based.

As said in Walker v. Fearhake, 22 Tex. Civ. App. 61, 52 S. W. 629:

"Against the matters set up in a plea in reconvention limitation will run up to the time of the filing of the plea. Fowler v. Stoneum, 11 Tex. 478 [62 Am. Dec. 490]; Senter v. Whitaker, 66 Tex. 624 [2 S. W. 89]. But against a plea of set-off where the claim was existing at the time the suit was filed, the filing of the suit suspended the statute."

In the case of Senter v. Whitaker, herein cited, it was sought to recover damages for a failure to sell certain cotton on a rising market which was pleaded by a defendant, and the court held that it was a plea in reconvention and barred in two years.

In article 1325, Rev. Stats., it is provided that any counterclaim may be pleaded against the claim of the plaintiff. That provision has no reference to matters purely defensive, but has in view matters that are offensive in their character. In other words, it seems to be a recognition of the rule of reconvention as it is recognized by the civil law. There is a well-defined rule that in order to plead a set-off it must not only arise out of the same transaction, but it must be of the same character as the claim of plain-

tiff. As stated in article 1329, Revised Statutes:

"If the plaintiff's cause of action be a claim for unliquidated or uncertain damages, founded on a tort or breach of covenant, the defendant shall not be permitted to set off any debt due him by the plaintiff; and, if the suit be founded on a certain demand, the defendant shall not be permitted to set off unliquidated or uncertain damages founded on a tort or breach of covenant on the part of the plaintiff."

Under that law appellee could not have used the matter of damages as an offset to the notes sued on, because one was liquidated and the other unliquidated. But, as said by the Supreme Court in Egery v. Power, 5 Tex. 501:

"And, although a claim not liquidated, or susceptible of immediate liquidation, cannot be pleaded in compensation, or set-off; * * * yet a claim for unascertained damages, arising out of the same transaction which is the subject of the suit, may be pleaded in reconvention."

[8] It follows that appellee's claim for damages, being unliquidated, could not be pleaded in offset or for compensation against the notes, and necessarily in order to sustain it the plea must be one in reconvention. That was the only plea that he could present to the court. It is evident that appellee did not intend the plea to be one of a partial or total failure of consideration because he sought not only to cancel the notes, but to obtain a judgment for any balance on damages over against appellant. The answer was not verified as required by law. It was not objected to, however, on that ground, and the lack of verification is mentioned merely to show that it was not intended as a plea of failure of consideration.

The Supreme Court, in the case of Nelson v. San Antonio Traction Co., 107 Tex. 180, 175 S. W. 434, lays down this principle of law, which is applicable in the present case:

"It is well settled in the authorities and beyond question that, if the traction company could have maintained the suit against Nelson to recover the amount paid for the repairs on the pavement, it was not a payment upon the sum agreed to be paid to Nelson, but would constitute damages which it was entitled to recover because the failure of Nelson to perform the work compelled the defendant in error in performance of its contract with the city to pay the amount claimed. * * * The conclusion, then, is necessarily reached that if it was the subject of an independent action by the traction company against Nelson, and did not constitute payment to Nelson for any part of the contract made with the traction company, the statute of limitation would begin to run from the time each item of the claim against Nelson originated; and, if due and payable more than four years before the institution of the action by Nelson against the traction company, such claims of the traction company were barred by * * * limitation."

The suit for damages arising from fraud was open to appellee at any time after the fraud was discovered or could have been discovered by the exercise of reasonable diligence, and the statute of limitation would begin to run from that time. Howard v. Randolph, 73 Tex. 454, 11 S. W. 495. The facts in this case bring it peculiarly within the scope of Ft. Smith v. Fairbanks, 101 Tex. 24, 102 S. W. 908, in which it was held that limitation does not run against a claim of failure of consideration pleaded as a defense to plaintiff's suit on the contract; but where defendant pleads same, not in avoidance of such liability, but as a basis for a cross-action for damages, limitation applies to such cross-action.

The part of the judgment as to Black is not before this court and will not be disturbed, but the judgment as between appellant and appellee is reversed, and judgment here rendered in favor of appellant for the amount of his notes, interest, and attorney's fees, and all costs of this and the lower court; that his lien be foreclosed as prayed for; and that appellee take nothing by his cross-action.

## On Motion for Rehearing.

As one of the grounds relied upon to attack the contract of purchase of the land, appellee alleged that:

Black "asked the defendant to agree to sell him a one-half interest in the ranch on the basis of the same price that the defendant was contracting to buy same, and told the defendant that he wanted to form a partnership with the defendant to handle and dispose of the ranch, and wanted to own one-half of the ranch, and represented to the defendant the enormous profits that could be made out of the ranch, and by such representations and such conduct the said John R. Black succeeded in forming a partnership with the defendant to manage, run, operate, and sell the ranch, and by such representations and conduct induced the defendant not to make any other investigation, but to rely upon the statements of the said John R. Black."

When those allegations were made appellee deemed the offer of partnership, which was accepted, as one of the strongest matters offered to show fraud upon the part of Binder through his agent, Black. He failed to comprehend the position in which he placed himself when he solemnly pleaded that he had made a contract with the agent of Binder, before the contract of purchase, to take him in as a partner in the land. He not only made the allegations that he had knowingly assisted the agent in acting for himself and contrary to the interests of his principal, but he did all in his power with his testimony to sustain the allegations. Appellee swore positively that he did not sign any contract until the offer of partnership was made by Black and accepted by him. After making the allegations, after swearing to them and testifying in a forceful manner to uphold them, he now appears before this court and asseverates with much heat and emphasis, in many pages of his motion for rehearing, that this court in taking appellee's allegations as true, and whether true or not, as binding on appellee, and that his evidence in support of his allegations was to be accepted rather than that of Black, is a plain invasion of the province of

the jury. Did not the jury find that the allegations and evidence of appellee were false and that the testimony of Black should be credited? Is the court invading the sacred province of the jury in holding that appellee is bound by his admissions in both allegation and proof? That is the attitude in which appellee is placed by his intemperate motion for rehearing, in which the court is informed that it "arbitrarily set aside the findings of the jury on this very issue and substituted its own conclusions of fact for the conclusions found· by the jury."

Appellate courts in Texas are required by law, and from education and inclination are disposed, to show great deference for verdicts of jury; but they are not inclined to uphold a verdict that is in the very face of the pleadings and evidence of a plaintiff himself, in response to his demand that his allegations and proof must be discarded and evidence of a man, alleged by him to be a swindler and defrauder, taken as true, and build a recovery thereupon. The facts, however, tend to show that appellee told the truth about the partnership between him and Black, and the only possible ground on which there is any conflict between him and Black is as to the exact time when the partnership was formed. Appellee by allegation and testimony made the partnership the chief inducement to the purchase of the land. It is not claimed in the motion for rehearing that appellee did not swear that the partnership was formed before the sale of the land was consummated, and was the chief inducement thereto; but Black, the man who misled and deceived appellee, is the sole reliance upon which the verdict is hinged. Not only this, but Black is represented as a plaintiff, although he came in as an intervener, and his allegations as to the partnership being formed after the contract was made are quoted and relied on, although each and every one of them were denied by appellee in a supplemental answer. The allegation, however, of Black, shows that a verbal agreement was made as to the partnership before the sale was perfected; his allegation being as to the written contract which was executed on May 27, 1911, just two weeks after appellant had sold the land to appellee. The written contract recites the existence of a verbal agreement of partnership in the land.

While appellee cites authority to show that the opposing party may by his evidence explain or even disprove the existence of a fact testified to by a plaintiff, and the jury might take the evidence of the defendant upon which to base a verdict for the plaintiff, he fails to cite any case that holds that the evidence of the defendant contrary to ˙one of the main points relied upon in the petition for a recovery and supported by the deliberate careful testimony of the plaintiff can be taken in the ˙face of such allegation and proof as a basis for a finding in favor of the plaintiff. The decisions cited refer to some isolated fact or circumstance, and not to a theory of recovery fixed by allegation and proof. Railway v. Von Hoesen, 91 S. W. 604; Railway v. Murray, 99 S. W. 144.

In the case of Connor v. Uvalde Bank, 156 S. W. 1092, the rule on the subject, as laid down by the courts of Missouri, is copied as follows:

"If it is a mere construction of phrases or expressions used by the witness in detailing his testimony as to whether the statements are favorable or unfavorable to his side of the case, then there is no necessity, nor is it error, to refuse an instruction embodying the principle in the one before us. It is simply the province of the jury, guided by the general instruction as to the credibility of witnesses and the weight to be attached to their testimony, to determine the credit of such witness and the force and effect of his testimony. If a plaintiff or defendant testifying in a cause make statements which may be construed unfavorably to them, it is the province of the jury to consider them; but, unless such statement amounts to an admission of a fact material to the issue, it is not the province of the court to assume that unfavorable statements have been made and instruct the jury on that subject."

[9] In this case, however, the trial court could with perfect propriety have instructed the jury that it had been admitted by appellee that he formed a partnership with the agent of appellant prior to the purchase of the land and that the formation of the partnership was the chief inducement to the purchase of the land. Appellee pleaded and proved the theory upon which he sought to recover, and he will not be permitted to recover on a theory made by the evidence of an intervener, who had conspired with him as against the principal. No case has been offered to sustain such a position, and none will be, because it is contrary to all rules of law and right applicable to the question.

There is not one word of testimony tending to show that Binder knew of the partnership between Black and appellee, but all of the testimony shows that he did not. Although it is so stated in the motion for rehearing, Black did not swear that he informed Binder about the partnership. What he said about informing Binder was before the partnership was mooted, and was in regard to an interest that Black had in the land being kept by him. In order to show that Binder knew about the transaction, evidence of Black, to the effect that at the very start of the negotiations appellee tried to get Black to defraud his principle and "stand in" with him, is cited with approval by appellee.

The defense pleaded in this case was not contemplated in the first answer, but was set up about four months after the suit had been filed, and in the third amended answer, upon which the cause was tried, there was no plea of failure of consideration, as is stated in the original opinion; but we find that a plea of failure of consideration was

filed as a second trial amendment on April 14, 1917, about four days before the cause was submitted to the jury. The cause was submitted to the jury on the theory of damages arising from fraud and not on failure of consideration. The jury so understood it and stated:

"We find that defendant Millikin is entitled to recover damages as an offset in the nature of a credit on said notes, and find as such damages the sum of $125,756.52, which is the difference between the amount for which the land and personal property sold, to wit, $300,000, and the market value of such land and personal property on May 25, 1911, etc."

However, the plea of failure of consideration was verified by affidavit and filed as a second trial amendment, and the statement made in our former opinion to the contrary is hereby corrected. This will not alter the disposition of the cause.

Black wrote Binder on April 26th, just after the preliminary contract was closed, that appellee had taken all of the land when at that very time he had entered into the partnership and retained one-half the property and on the next day, April 27, 1911, he telegraphed appellee, at Tulsa, Okl., asking him to write a letter stating that appellee would sell Black a half interest in the land. It is contended that the testimony was an innocent scheme on the part of Black to get a bonus from some one, but the fact remains that one month after that one-half the land was contracted by appellee to Black. That contract recites the existence of the verbal agreement to convey one-half the land, and the evidence shows that the verbal agreement must have been made before appellee left San Antonio, and before the preliminary contract was signed, because just as soon as that contract was signed appellee left for Tulsa, and remained there until and after the contract of partnership with Black was signed. It is not claimed that the verbal contract was made by telephone, and consequently it·could not have been made while Black was in San Antonio and appellee was in Tulsa. There is no escape from this conclusion.

The motion for rehearing is overruled. ·